# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

HEATHER ELIZABETH HAMOOD,
an individual,

      Plaintiff,

            Case No. 2:18-cv-13194

v.           Honorable Marianne O. Battani

TRINITY HEALTH CORPORATION, an
Indiana non-profit corporation, INFINITY
PRIMARY CARE, PLLC, a Michigan
professional limited liability company,
ANTHONY VETTRAINO, an individual,
RAKESH PATEL, an individual, and DANIEL
MERAM, an individual, jointly and severally,

      Defendants.

---

## DEFENDANTS, INFINITY PRIMARY CARE, PLLC AND ANTHONY VETTRAINO'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56(c)

   Defendants, Infinity Primary Care, PLLC ("IPC") and Anthony Vettraino, by and through their undersigned counsel, hereby move this Court for an Order granting their Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56(c) for the reasons set forth in their Brief in Support filed contemporaneously herewith.  Pursuant to Local Rule 7.1, IPC and Dr. Vettraino sought concurrence in the relief requested in this Motion from Plaintiff's counsel on November 8, 2019, but such concurrence was not forthcoming.

Date: December 16, 2019          Respectfully submitted,

/s/Heather G. Ptasznik
BY: Heather G. Ptasznik (P63344)
OGLETREE, DEAKINS, NASH, SMOAK
  & STEWART, PLLC
Attorneys for Defendants Infinity Primary
  Care, PLLC and Dr. Anthony Vettraino
34977 Woodward Avenue, Suite 300
Birmingham, MI 48009
(248) 723-6124
Heather.Ptasznik@Ogletree.com

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

HEATHER ELIZABETH HAMOOD,
an individual,

                      Plaintiff,

                                              Case No. 2:18-cv-13194
v.                                    Honorable Marianne O. Battani

TRINITY HEALTH CORPORATION, an
Indiana non-profit corporation, INFINITY
PRIMARY CARE, PLLC, a Michigan
professional limited liability company,
ANTHONY VETTRAINO, an individual,
RAKESH PATEL, an individual, and DANIEL
MERAM, an individual, jointly and severally,

                      Defendants.

_____

**DEFENDANTS, INFINITY PRIMARY CARE, PLLC AND ANTHONY**
**VETTRAINO'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY**
**JUDGMENT PURSUANT TO FED.R.CIV.P. 56(c)**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

CONCISE STATEMENT OF THE ISSUES PRESENTED ....................................... v

CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR THE RELIEF SOUGHT ... vi

STATEMENT OF UNDISPUTED FACTS ................................................................ 1

      A.    Heather Hamood. ......................................................................... 1

      B.    Infinity Primary Care and Trinity/St. Mary's Relationship ............................ 2

      C.    First Year of Residency (July 1, 2015-June 30, 2016). ..................... 2

      D.    Second Year of Residency (July 1, 2016-June 30, 2017). ................. 4

      E.    Plaintiff fails USMLE Step 3 for the third time ................................. 9

STANDARD OF REVIEW ....................................................................................... 10

LEGAL ARGUMENT ............................................................................................... 11

I.     PLAINTIFF'S CLAIMS UNDER TITLE VII (COUNTS I AND II) MUST BE DISMISSED AS A MATTER OF LAW. ................................................... 11

II.    THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM FAILS ................................................................................................. 12

      A.    IPC is not liable for the alleged intentional tortious acts of its employees that are outside the scope of employment. ................................ 12

      B.    There is no IIED claim against Dr. Vettraino. ................................ 12

III.   PLAINTIFF'S CLAIMS UNDER THE ELLIOTT-LARSEN CIVIL RIGHTS ACT SHOULD BE DISMISSED. ........................................................ 15

      A.    IPC was not Plaintiff's employer and she cannot bring a claim against it under the ELCRA, or its non-supervisory employee Dr. Vettraino, for hostile work environment. ................................................................ 15

      B.    Plaintiff cannot establish her prima facie case of hostile work environment. 16

      C.    Plaintiff's claim for quid pro quo sexual harassment fails. ........................ 18

i

IV.     THE ASSAULT AND BATTERY CLAIMS MUST BE DISMISSED. ................... 19

CONCLUSION ....................................................................................................................... 20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abeita v. Transamerica Mailings, Inc.*,
 159 F.3d 246 (6th Cir. 1998) ................................................11

*Alexander v. Caresource*,
 576 F.3d 551 (6th Cir. 2009) ................................................11

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986).............................................................11

*Bryant v. Brannen*,
 180 Mich. App. 87, 446 N.W.2d 847 (1989)........................12

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986).............................................................10

*Chambers v. Trettco, Inc.*,
 463 Mich. 297, 614 N.W.2d 910 (2000).........................17, 18

*Champion v. Nationwide Security, Inc.*,
 450 Mich. 702, 545 N.W.2d 596 (1996)...............................18

*Doe v. Mills*,
 212 Mich. App. 73, 536 N.W.2d 824 (1995)........................12

*Elezovic v. Bennett*,
 274 Mich. App. 1, 731 N.W.2d 452 (2007).....................15, 17

*Elezovic v. Ford Motor Co.*,
 472 Mich. 408, 697 N.W.2d 851 (2005)...............................15

*Espinoza v. Thomas*,
 189 Mich. App. 110, 472 N.W.2d 16 (1991)........................19

*Gibbs v. Voith Indus. Servs.*,
 60 F. Supp. 3d 780 (E.D. Mich. 2014)..................................12

*Lan Nguyen v. GMC*,
 2006 U.S. Dist. LEXIS 60088 (W.D. Mich. 2006)...............13

*Mitchell v. Daly*,
 133 Mich. App. 414, 350 N.W.2d 772 (1984)......................19

*Radtke v. Everett*,
    442 Mich. 368, 501 N.W.2d 155 (1993)........................................................................16, 17

*Roberts v. Auto-Owners Ins. Co.*,
    422 Mich. 594, 374 N.W.2d 905 (1985)..............................................................................13

*Salinas v. Genesys Health System*,
    263 Mich. App. 315, 688 N.W.2d 112 (2004)....................................................................12

*Selph v. Gottlieb's Fin. Servs., Inc.*,
    35 F. Supp. 2d 564 (W.D. Mich. 1999) ..............................................................................13

*Sheridan v. Forest Hills Pub. Schl.*,
    247 Mich. App. 611, 637 N.W.2d 536 (2001)....................................................................17

*Thomas v. Speedway SuperAmerica, LLC*,
    506 F.3d 496 (6th Cir. 2007) ..............................................................................................10

*Vance v. Ball State Univ.*,
    570 U.S. 421 (2013)............................................................................................................15

*Wathan v. General Elec. Co.*,
    115 F.3d 400 (6th Cir. 1997) ..............................................................................................11

*Yost v. Paychex, Inc.*,
    1998 WL 1989811 (Mich. Ct. App., Sept. 29, 1998) ....................................................13, 16

*Zsigo v. Hurley Medical Center*,
    475 Mich. 215, 716 N.W.2d 220 (2006)..............................................................................12

**Federal Rules of Civil Procedure**

Fed.R.Civ.P. 56(c) ....................................................................................................................10

## CONCISE STATEMENT OF THE ISSUES PRESENTED

I.  WHETHER PLAINTIFF'S CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT SHOULD BE DISMISSED BECAUSE PLAINTIFF DID NOT FILE A CHARGE OF DISCRIMINATION AGAINST INFINITY PRIMARY CARE, PLLC OR DR. VETTRAINO AND THERE IS NO INDIVIDUAL LIABILITY UNDER THE ACT?

**Defendants' Answer:      Yes.**

II.  WHETHER PLAINTIFF'S STATE LAW CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM?

**Defendants' Answer:      Yes.**

III.  WHETHER PLAINTIFF'S CLAIMS UNDER THE ELLIOTT-LARSEN CIVIL RIGHTS ACT FOR HOSTILE WORK ENVIRONMENT AND QUID PRO QUO SEXUAL HARASSMENT SHOULD BE DISMISSED BECAUSE INFINITY PRIMARY CARE, PLLC WAS NOT HER EMPLOYER; AND IN THE ALTERNATIVE, DR. VETTRAINO WAS NOT AN AGENT AS DEFINED UNDER THE ACT AND PLAINTIFF ADMITTEDLY FAILED TO REPORT SUCH ALLEGATIONS TO ANYONE UNTIL AFTER SHE WAS DISMISSED AND TERMINATED FROM THE RESIDENCY PROGRAM AND EMPLOYMENT WITH TRINITY?

**Defendants' Answer:      Yes.**

IV.  WHETHER PLAINTIFF'S CLAIMS AGAINST DR. ANTHONY VETTRAINO FOR ASSAULT AND BATTERY SHOULD BE DISMISSED FOR FAILURE TO STATE A PRIMA FACIE CASE?

**Defendant's Answer:      Yes.**

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY<br>FOR THE RELIEF SOUGHT</u>

**<u>Dismissal of Title VII Claims</u>**

*Abeita v. Transamerica Mailings, Inc.*, 159 F.3d 246 (6th Cir. 1998)
*Wathan v. General Elec. Co.*, 115 F.3d 400 (6th Cir. 1997)

**<u>Dismissal of Intentional Infliction of Emotional Distress Claim</u>**

*Bryant v. Brannen*, 180 Mich. App. 87, 446 N.W.2d 847(1989)
*Zsigo v. Hurley Medical Center,* 475 Mich. 215, 716 N.W.2d 220 (2006)

**<u>Dismissal of the Elliott-Larsen Civil Rights Act Claims</u>**

*Elezovic v. Ford Motor Co.*, 472 Mich. 408, 697 N.W.2d 851 (2005)
*Radtke v. Everett,* 442 Mich. 368, 501 N.W.2d 155 (1993)
*Champion v. Nationwide Security, Inc.*, 450 Mich. 702, 545 N.W.2d 596 (1996)
*Chambers v. Trettco, Inc.*, 463 Mich. 297, 614 N.W.2d 910 (2000)

**<u>Dismissal of the Assault and Battery Claims</u>**

*Mitchell v. Daly,* 133 Mich. App. 414, 350 N.W.2d 772 (1984)

## STATEMENT OF UNDISPUTED FACTS

**A.** **Heather Hamood:** Although not a stellar performer in her college science classes,[1] in 2005, Plaintiff applied to medical school. **Transcript, Ex. EE.** Plaintiff took the MCAT exam three times, scoring in the bottom 1%, 1% and 5% respectively. **MCAT Score Card, Ex. FF.** After graduating college in May 2006, Plaintiff lived with her parents and was not employed. **Dep. H. Hamood, Ex. I, pp. 34, 81**. No U.S. medical schools accepted Plaintiff, so she applied to and began medical school in May 2008 at American University of Antigua College of Medicine, a foreign medical school in the Caribbean, which did not require the MCAT. **Ex. I, pp. 34, 36-38**. The medical school placed Plaintiff on an extended five year program because her science GPA was not good. **Ex. I, p. 43**. While in medical school, Plaintiff failed her USMLE[2] Step 1 exam (**Ex. G; Ex. I, p. 88**) and claimed (although subsequently unfounded) this was due to a technical error with the test, not her own inabilities. **E-mail of July 14, 2010, Ex. GG; Ex. I, p. 89**.

After completing clinical rotations in February 2013, it was too late for Plaintiff to find a residency placement through the MATCH[3] program. **Ex. I, pp. 83-84**. In September 2013, Plaintiff entered the MATCH program and began interviewing with some residency programs, but withdrew after failing the USMLE Step 2 (Clinical Knowledge) exam in October 2013. **Ex. I, p. 85-86**. Plaintiff re-applied for the MATCH program in September 2014, but <u>no</u> residency programs accepted her. **Ex. I, pp. 87, 89**. Thus, she used the SOAP program (see fn. 3),

---

[1] Plaintiff's received Cs, Ds and an F (or withdrew) in her basic science classes. **Ex. I, p. 29**.

[2] The USMLE is a required three-step examination for medical licensure in the U.S. and assesses a physician's ability to apply knowledge, concepts, and principles, and demonstrate fundamental patient-centered skills that are important in health and disease and that constitute the basis of safe and effective patient care. See www.usmle.org.

[3] The MATCH program provides a uniform time for applicants and programs to make their training selections. Applicants may be "matched" to residency programs using the certified rank order lists of the applicants and program directors, or they may obtain one of the available unfilled positions during the Match Week Supplemental Offer and Acceptance Program (SOAP). See www.nmp.org.

scrambling to look for <u>any</u> open residency position. **Ex. I, p. 88, 90.**  In or about March 2015, St.

Mary Mercy Hospital (which had initially rejected Plaintiff in the MATCH program without even

interviewing her) was the <u>only</u> program that offered her a residency position. **Ex. I, pp. 91-92**.

     **B.**    <u>**Infinity Primary Care and Trinity/St. Mary's Relationship**</u>:  Infinity Primary

Care, PLLC ("IPC") is a third party vendor providing administrative and teaching services, through

its physician employees, to Trinity Health-Michigan, d/b/a Saint Mary Mercy Hospital ("Trinity")

pursuant to an independent contractor agreement. **Dep. of S. O'Dowd, Ex. B, p. 7; Agreement**

**and Amendment at Ex. KK**.  IPC's physician employees are not employees of Trinity and the

two are independent entities. **Ex. B, p. 7**; **Dep. of A. Vettraino, Ex. D, p. 14.**  Plaintiff was only

ever employed by Trinity. **Ex. I, pp. 355, 359.**  Plaintiff had no contractual, employment or other

relationship with IPC.   Effective July 1, 2015, Dr. Stacy O'Dowd became the Program Director

of the Family Medicine Program at St. Mary Mercy Hospital ("St. Mary's") to replace Dr. Anthony

Vettraino. **Ex. B, p. 10, 38-39; Ex. D, pp. 14-15, 21; Ex. KK**.  Dr. Vettraino remained Associate

Program Director, for one year to assist Dr. O'Dowd with the transition, as well as a Core Faculty

member.  Core Faculty are essentially teachers and have no authority to hire, fire, discipline or

affect the terms and conditions of a resident's employment with Trinity. **Ex. B, p. 185**.

     **C.**    <u>**First Year of Residency (July 1, 2015-June 30, 2016)**</u>:  In July 2015, Plaintiff

began her first year of residency in St. Mary's Family Medicine Program, pursuant to her

employment agreement with Trinity. **Agreement, Ex. A**.  In orientation, Sue Greenwood-Clark,

St. Mary's Director of Medical Education, provided Plaintiff with a presentation and St. Mary's

harassment and discrimination policies. **Dep. of S. Greenwood-Clark, Ex. C, pp. 79-80**; s**ee**

**Harassment Policies, Ex. CC.**  Plaintiff received a semi-annual evaluation in November 2015

which notes: "*functioning at expected level for 1st year resident.  Great rapport with patients and*

2

*staff*" and her educational plan was to "*get more comfortable with computer, develop more confidence in knowledge and skills*." **SMMH Family Medicine Residency Developmental Milestones/Semi-Annual Evaluation Form, Ex. E.** A few weeks later, consistent with her prior first attempt failures on the Step 1 and Step 2 exams, Plaintiff failed the USMLE Step 3 exam. **Step 3 Score Report, Ex. G.** The USMLE Step 3 examination assesses whether residents "can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine, with emphasis on patient management in ambulatory settings. It is the final examination in the USMLE sequence leading to a license to practice medicine without supervision." **Information from USMLE.org, Ex. H; Ex. B, p. 115.** All residents are required to pass the USMLE Step 3 exam prior to commencing their third year of residency. **Ex. C, p. 30.** In Michigan, a resident is only allowed three (3) opportunities to pass the USMLE Step 3 test after which she is no longer eligible to practice medicine in the state. **Ex. C, p. 30; Ex. B, pp. 88-89; Ex. I, p. 274.** **See also, Federation of State Medical Boards website at https://www.fsmb.org/step-3/state-licensure/.** At the same time, Plaintiff agreed she was not performing up to standards and it was proper to place her on a study plan due to low scores on the In-Training Examination. **Ex. I, pp. 152-154.** On January 22, 2016, Plaintiff's Family Medicine rotation evaluation noted: "*Her video showed areas needed to work on including increasing her confidence, sharpening her examination skills and filtering through information to find what is relevant for the encounter*." **Family Medicine Outpatient Year 1 Evaluation, Ex. F.**

Thus, within the early part of her first year, (1) the Family Medicine Program had already noted Plaintiff was deficient with her examination skills and ability to filter through and synthesize medical information, (2) she had been placed on a study plan due to her low scores on an in-training examination, and (3) she failed her USMLE Step 3 exam.

3

By the end of her first year, Program Director Dr. O'Dowd, who precepted with Plaintiff, opined "*she seemed to be able to collect the information. She was able to collect the history and ask appropriate reviews—reviews of systems questions, but she had difficulty coming up with assessments and appropriate management*." **Ex. B, p. 32**. Plaintiff would have compared similarly to other first year residents in "*the collection of the history, but she did not compare similarly in the—in her physical and diagnostic skills and her ability to create a plan that was well thought out and had detail*." **Ex. B, p. 33**. For example, Dr. O'Dowd had personally witnessed Plaintiff's procedural deficits such as not using the right amount of pressure when palpating and had an aggressive insertion of a speculum into a patient for which she failed to close the bills when removing it from a patient during a gynecological exam. **Ex. B, p. 34**. Although Plaintiff was the weakest of the first-year residents on many levels (history taking skills, physical exam skills, problem solving skills), the Family Medicine faculty thought they could work with her and fix things in her second year. **Ex. D, pp. 43-44**. In Family Medicine, it is hard to assess significant deficits in the first year because residents are working with different outside preceptors and faculty; however, most of the significant deficits start to show (and did show in Plaintiff) during the second year. **Ex. D, p. 79**.

   **D.     Second Year of Residency (July 1, 2016-June 30, 2017):** St. Mary's offered and Plaintiff accepted a contract for her second year of residency in which it was specifically noted she must pass the USMLE Part 3 exam to be eligible for promotion to the third year. **Agreement, Ex. J**. Although he had stepped down as Associate Program Director on July 1, 2016, Dr. Vettraino remained part of the Core Faculty and a Faculty Advisor to Plaintiff and others. **Ex. D, pp. 14-15**. As Plaintiff was entering her second year, more was expected of her because she, like all second year residents, are given more independence and responsibility. **Ex. B, p. 54**; **Ex. D, pp. 50-51**.

4

On September 21, 2016, in his position as Core Faculty, Dr. Vettraino observed Plaintiff "*continues to progress….work on organization of presentations and focus on important information. Listen more and digest what preceptors are telling you.*" **SMMH Family Medicine Residency Developmental Milestones/Semi-Annual Evaluation, Ex. K.** Plaintiff still needed to work on her organization and presentation of facts and listen to/digest the information her teachers were relaying. On November 4, 2016, the Family Medicine faculty and preceptors (for the period September 26-October 23) collectively noted "*Her medical knowledge is above average but she has difficulty synthesizing it into a meaningful assessment and plan. She often jumps to conclusions when assessing patients without considering all of the information and alternatives, making her physical diagnostic skills weak. She needs repeated supervision and training in procedural skills.*" **Family Medicine Outpatient Year 2 Evaluation, Ex. L.** Although she passed this second year Family Medicine Outpatient rotation, her skills were primarily described as developing and below developing. *Id.* Again, midway through her second year, the Family Medicine faculty noted severe deficiencies with Plaintiff's skillset as a physician.

Three weeks later, Plaintiff received two failing evaluations on her Family Medicine-Inpatient rotation. Dr. Mark Michaels specifically noted Plaintiff's "*clinical presentations frequently lacked important pieces to the clinical story and ended without a well thought out plan. She frequently exhibited a lack of comprehensive knowledge of the patients on the service. Her sign outs often did not communicate appropriate important details to the receiving team in an organized fashion. She frequently lacked the ability to independently make appropriate clinical evidence based decisions. The above mentioned aspects are vital to successful passage of this rotation and were not met.*" **Inpatient Family Medicine evaluation and notes of 11/13/16, Ex. M.** Dr. Rakesh Patel likewise opined: "*…she even appears to have knowledge, but she is not able*

*to connect with patient and clinical scenarios*." **Inpatient Family Medicine evaluation, Ex. N.** The Clinical Competency Committee also noted Plaintiff had "*difficulty synthesizing information into usable assessment and plan.*" **Summary of Clinical Competency Committee (CCC) Meeting Notes, Ex. DD.** Almost contemporaneous with this failed rotation, Plaintiff learned she had <u>failed her USMLE Step 3 exam for the second time</u>. Rather than take responsibility (just like when she failed her Step 1 exam), Plaintiff alleged her score had been "hacked", but no one has ever recognized this. **Ex. I, pp. 274, 275.**

Having <u>again</u> failed the USMLE Step 3 exam and her inpatient rotation, after speaking with Dr. Vettraino (and her family), Plaintiff was granted two months of unpaid time off to study in hopes of passing the USMLE Step 3 exam. Plaintiff profusely thanked Dr. O'Dowd, Dr. Vettraino and Sue Graham "for your endless support during this time. I can't thank you, Dr. Vettraino and Sue enough!!" **E-mail of December 14, 2016, Ex. O**. Prior to taking the leave, Plaintiff was told she would be placed on a Remediation Plan to address the performance deficiencies noted in her Family Medicine rotations. **Ex. O; Ex. I, p. 250**; **LOA form, Ex. P**. The Remediation Plan was a focused educational <u>tool</u> to help support Plaintiff get through her clinical deficits so she could stay in the program. **Ex. B, pp. 153, 154; Process for Correcting Resident Deficiencies (Remediation) Policy, Ex. V; Ex. C, p. 53.**

Plaintiff extended her leave of absence until after she re-took the USMLE Step 3 and returned on March 13, 2017. Plaintiff was then placed on the 90 day Remediation Plan as previously discussed. **Ex. O**. However, during her Remediation Plan, Plaintiff's Family Medicine evaluations again demonstrated she lacked important skills required of a second year resident. Family Medicine Core Faculty Dr. Gary Falkenberg (whom Plaintiff admits always treated her

"fairly, equally, respectfully."  **Ex. I, pp. 181-182**) noted severe deficiencies in her performance

including:

> •March 20, 2017: *has a wealth of unorganized information.  Spits out information like an unaimed machine gun....pre-conceived idea based on incoming chart information. Did not determine important from unimportant data. Treatment plan was* <u>adequate</u> *for established diagnosis.  Charting could be more informative*;

> •March 20-23, 2017: *Diagnosis always based on patient complaint-even when not supported by physical findings; very good at describing procedure but still lacks proficiency; has a higher confidence level than she can demonstrate...overall not performing at a second year resident*;

> •March 23, 2017: *a common fault is that resident tries to do too much with each patient. Does not always have a direction or an end point*;

> •March 23, 2017: *straight forward case-unsure at how to establish a diagnosis when all testing is normal*;

> •March 27-30, 2017: *physical is inadequate-needs constant review of videos and constant practice. Not proficient in evaluation of gathered material to establish an accurate diagnosis...no progress in physical exam skills. Level of learning-status quo*;

> •March 29, 2017: *history was prolonged; attempting to find a diagnosis in a relatively normal individual; physical exam inadequate, technique was not same as she demonstrated after watching tapes....asks leading questions; goes through the motion of an exam, but appears not to know what she is looking for...still has a wealth of knowledge that needs to be unscrambled*;

> •March 30, 2017: *attempts to justify diagnosis based on patient complaints...physical exams inadequate (watched video on knee exam but did not perform "learned" exam)*;

> •April 3, 2017: *too much time spent on simple case; too much time spent on using computer, history too involved for an easy case; asks leading questions, physical exam inadequate/unorganized; not sure information gathered was accurate to make a diagnosis. Technique is poor; impression is that diagnosis is established prior to resident seeing patient; have reviewed previous exams with resident and informed her that the exam and technique was poor-advised to continue viewing videos and practice on MA.  Overall progress in performing physical exam is lacking organization in history and physical needs improvement. Knows all the terms and diseases but cannot organize this knowledge into a meaningful diagnosis and treatment plan*.

**(Ex. Q)**. Dr. Falkenberg's observations were <u>consistent</u> with the September-November 2016

observations of others in Plaintiff's Family Medicine Inpatient and Outpatient rotations.

Further, in reviewing Plaintiff's examination of a patient who presented with a sore throat, Sue Graham and Dr. Vettraino noted: *examined throat last as an afterthought; exam was disorganized and awkward; spent a lot of time looking at computer and typing; history was disorganized with many irrelevant questions; no sequencing to the exam; and wrap up with patient was insufficient with no education or explanation*.  **Summary of Faculty Comments on Video Recorded Patient Encounter and Assessment forms, Ex. T**.  Additionally, Dr. Vettraino noted, through April and June, in part:

> • *Plaintiff unable to evaluate if a child's immunization are up to date, determine possible causes or discuss a course of treatment for umbilical hernia*;
>
> • *Plaintiff unable to demonstrate how to do a wet mount, physical exam was not focused and Plaintiff did not do an abdominal exam or check for CVA tenderness in a patient with vaginal discharge but rather looked in the patient's eyes; unable to think about why a patient who had a tubal ligation was given an IUD*;
>
> • *In examining a sore throat, did not seem to know what doing or examining; was unable to come up with a diagnosis or treatment plan*; *and*
>
> • *Plaintiff's histories were still vague and incomplete and she could not give a rationale for causes or treatments.*

**See Weekly Performance Evaluations, Ex. U.**  On June 13, 2017, after being on her Remediation Plan for 90 days and having follow up meetings with Dr. O'Dowd approximately every 30 days to review her progress, Dr. O'Dowd, as Program Director, made a recommendation to Dr. John O'Brien, St. Mary's Director of Medical Education and DIO (designated institutional official) that Plaintiff was not able to function at her level of training, had not fulfilled her program requirements nor the requirements set forth to successfully pass her Remediation Plan and would be unable to continue in the program effectively immediately.  **Performance Remediation Plan dated June 13, 2017 (and Remediation Plans 1-3), Ex. R-4.**  Although Dr. O'Brien had the authority to override Dr. O'Dowd's recommendation, he did not and on June 13, 2017, Plaintiff was advised

of her termination from St. Mary's residency program.  **Ex. B, p. 185; Ex. I, p. 292.**  Plaintiff's

appeal to Trinity of the termination decision was ultimately denied.

       E.    <u>**Plaintiff fails USMLE Step 3 for the third time:**</u>  In the interim, on May 3,

2017, Plaintiff and her father arrived unannounced and advised Dr. O'Dowd and Dr. Vettraino

(separately) that Plaintiff had failed her USMLE Step 3 <u>for the third time</u>.  **Ex. I, p. 275**.  Given

her <u>third failure</u>, Plaintiff knew she was not qualified to move into the third year of residency nor

to practice medicine in the State of Michigan.  **USMLE Requirements for Advancement Policy,**

**Ex. S.**  Trying to find an excuse for her failure, Plaintiff <u>again</u> claimed her score on this USMLE

exam was "hacked".  **Ex. X.**  On May 6, 2017, knowing she could not continue in the residency

program because she failed her USMLE Step 3 test for the third time (apart from the fact she was

not successfully completing her remediation plan and could never practice medicine in the State

of Michigan), Plaintiff, <u>for the first time</u>, accuses Dr. Vettraino of being a "bully"---<u>that's it</u>!  **E-**

**mail of May 6, 2017, Ex. W.**  On May 10, 2017, Plaintiff advised Dr. O'Dowd Dr. Vettraino was

"very critical."  **E-mail of May 10, 2017, Ex. X**. However, neither the May 6 nor May 10 e-mail

suggested or alleged anything even remotely close to sexual harassment or that she was touched

inappropriately.

       On June 7, 2017, a *desperate* Plaintiff e-mailed Dr. O'Dowd, in advance of her final June

13 Remediation Plan meeting and asked if it will be a "positive one", that she has retained an

attorney because she believes her USMLE Step 3 scores (again) were hacked, and was "at your

mercy and I beg of you for your entire support. Please help me preserve my career."  **E-mail of**

**June 7, 2017, Ex. Y**.  On June 10, 2017, Plaintiff pleaded with Dr. O'Dowd if she could "assure

me before the meeting on June 13th that something positive is going to come out of this meeting?"

and thanked her for her "endless support."  **E-mail of June 10, 2017, Ex. Z**.  However, on June

9

13, 2017, Plaintiff was notified she had not fulfilled the requirements of the program nor successfully passed her Remediation Plan, and would not be able to continue.  It is only <u>weeks later, during her appeal process at Trinity</u> that Plaintiff alleges, <u>for the first time</u>, that Dr. Vettraino inappropriately touched her eight months prior in October 2016 while showing her the proper way to do a sacroiliac joint examination on a patient complaining of lower back pain (*i.e.*, a back exam). **Ex. I, pp. 231-232, 298-299, 358-359.**  Although Plaintiff had gone to Trinity's Human Resources department in March 2017 to complain only about co-residents Dr. Bhatti and Dr. Meram's bullying, she admits at no time did she tell anyone, prior to her termination, that Dr. Vettraino had inappropriately touched her or sexually harassed her.  **Ex. I, pp. 253-254, 284-285**.  This was all an afterthought, to shift blame for her failures, on to someone else.

## STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) provides a motion for summary judgment shall be granted if the movant shows there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law.  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-333 (1986).  The Sixth Circuit has summarized the relevant legal standard:

> Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party.  To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact.  A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant].  *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007).

A plaintiff may not rely solely on her pleadings or subjective beliefs, but must come forward with probative evidence to support her claims.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Alexander v. Caresource*, 576 F.3d 551, 558 (6th Cir. 2009).  Here, summary

judgment is appropriate because (1) Plaintiff failed to exhaust her administrative remedies regarding her Title VII claims; (2) IPC was not her employer nor did Dr. Vettraino have the authority to adversely affect the terms of her employment with Trinity; and (3) she cannot establish a *prima facie* case with respect to the remaining claims against IPC and Dr. Anthony Vettraino.

## **LEGAL ARGUMENT**

### I. **PLAINTIFF'S CLAIMS UNDER TITLE VII (COUNTS I AND II) MUST BE DISMISSED AS A MATTER OF LAW.**

Federal courts do not have subject matter jurisdiction to hear Title VII claims unless the plaintiff explicitly filed an EEOC charge within 300 days of the alleged discriminatory act or the claim can be reasonably expected to grow out of it. *Abeita v. Transamerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998). Plaintiff alleges she was subject to harassment under Title VII (quid pro quo and hostile work environment) which culminated in her termination from employment with Trinity on June 13, 2017, and which was upheld on August 3, 2017. **Ex. AA, ¶¶75, 84, 91, 94, 101**. Plaintiff filed an EEOC Charge of Discrimination on July 28, 2017 against St. Mary Mercy Hospital and amended it on April 2, 2018 to include a retaliation charge against St. Mary Mercy. **EEOC Charge and Amended Charge**, **Ex. BB**. Plaintiff admitted she did not file her initial or amended charge against IPC. **Ex. I, pp. 355-357**. No charge has ever been filed against IPC. Because Plaintiff did not exhaust her administrative remedies against IPC[4], she cannot proceed under Title VII and Counts I and II of the Complaint must be dismissed with prejudice.

---

[4] Further, there is no individual liability under Title VII against Dr. Vettraino, a mere non-supervisory employee of IPC, and as such these claims against him must be dismissed. *See generally*, *Wathan v. General Elec. Co*., 115 F.3d 400, 405 (6th Cir. 1997).

## II. __THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM FAILS__.

### A. __IPC[5] is not liable for the alleged intentional tortious acts of its employees that are outside the scope of employment__.

Michigan employers are not liable for torts intentionally committed by an employee that are outside the scope of employment. *See Salinas v. Genesys Health System*, 263 Mich. App. 315, 317-18, 688 N.W.2d 112, 113 (2004). Where an employee is acting "to gratify some personal animosity or to accomplish some purpose of his own," he is not acting within the scope of his employment and his employer cannot be held liable. *Bryant v. Brannen*, 180 Mich. App. 87, 98, 446 N.W.2d 847, 852-53 (1989). In *Zsigo v. Hurley Medical Center,* 475 Mich. 215, 716 N.W.2d 220 (2006), the Michigan Supreme Court specifically held an employee was not acting within the scope of his employment when he allegedly sexually assaulted a patient at employer hospital; and as such, the employer was not liable for the alleged tort committed by its employee. As in *Zsigo*, in this case, it is difficult, if not impossible, to conceive a purpose that serves IPC for Dr. Vettraino's touching Plaintiff's buttocks as she describes as an assault/battery (and which is denied – **Ex. D, p. 65**). It is inconceivable Dr. Vettraino would have been acting within the scope of his employment as a Core Faculty member teaching in the residency program with respect to the assault/battery allegations made by Plaintiff. IPC cannot be held liable for this alleged tortious conduct and Count IV against it must be dismissed.

### B. __There is no IIED claim against Dr. Vettraino__.

In reviewing a claim for intentional infliction of emotional distress, "it is initially for the court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery." *Doe v. Mills*, 212 Mich. App. 73, 536 N.W.2d 824, 834 (1995);

---

[5] Furthermore, Plaintiff admits she never told anyone at IPC about the alleged conduct; thus, it is axiomatic that it could not have intentionally caused her emotional distress with respect to conduct of which it had no knowledge.

*Gibbs v. Voith Indus. Servs.*, 60 F. Supp. 3d 780, 802 (E.D. Mich. 2014).  To prevail, a plaintiff must show: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress.  *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985).  The Michigan Supreme Court has described "extreme and outrageous conduct" as follows:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id*. at 603.  Even viewing the facts in a light most favorable to Plaintiff, the allegations do not support a claim for intentional infliction of emotional distress.  *See Yost v. Paychex, Inc.,* 1998 WL 1989811 (Mich. Ct. App., Sept. 29, 1998) (alleged touching of breast, a forceful kiss, and one comment in a hot tub, not sufficient to support a claim for intentional infliction of emotional distress) (**Opinion, Ex. HH**); *Selph v. Gottlieb's Fin. Servs., Inc*., 35 F. Supp. 2d 564, 569 (W.D. Mich. 1999) (leaving notes on plaintiff's desk, kissing her, brushing up against her, and placing a hand on her knee, was not so outrageous as to go beyond all possible bounds of decency); *Lan Nguyen v. GMC,* 2006 U.S. Dist. LEXIS 60088 (W.D. Mich. 2006) (where supervisor subjected Plaintiff to a series of repulsive sexual comments and kissed Plaintiff this was insufficient to meet the very high standard of the tort) (**Opinion, Ex. II**).

Dr. Vettraino, a licensed physician for over 40 years, with over 30 years teaching in residency programs, had observed Plaintiff give another substandard physical exam in October 2016 (unorganized, no flow, did not examine the areas that needed examination).  **Ex. D, pp. 10, 12-14, 66**.  As her teacher, he offered to show her how to do a quick low back exam in an organized

manner.  *Id.*  Dr. Vettraino believed going through the exam, with him demonstrating it on Plaintiff, would help imprint the process on her, as on many occasions it had been noted that when Plaintiff palpates, she would only lightly glide her finger over an area without using enough force to determine whether there was tenderness or discomfort in the area.  **Ex. D, p. 67**; **Ex. B, p. 34.** Dr. Vettraino intended to show Plaintiff the amount of force or pressure she needed to use to palpate the spine and the sacral iliac joint/the joints where the pelvis and the spine connect, not to cause Plaintiff emotional distress.  **Ex. D, p. 67.**  Dr. Vettraino told her he was going to show her how to do a back exam, obtained Plaintiff's consent, went through a back exam including palpation of the sacral iliac joints with his thumbs and had Plaintiff walk on her tip toes and heels to demonstrate muscle strength.  **Id., pp. 67-69**.  Plaintiff herself testified that if a patient had a sacroiliac problem (which she agreed was down in the buttocks area), that she would also start at the top of the back and palpate down.  **Ex. I, p. 221**.

Plaintiff testified she role played with Dr. O'Dowd and performed a physical exam on her as well as medical assistants to practice skills.  **Ex. I, p. 282**.  Residency is a "teaching program" and one way to learn is for students and preceptors/faculty to actually perform the task.  Plaintiff thought there was nothing wrong with this methodology.  **Ex. I, pp. 217, 258**.  There is nothing outrageous about Dr. Vettraino performing a back exam on Plaintiff (who did not have knowledge regarding a proper back exam—resulting in her claim that her buttocks were improperly touched.).

After the alleged October 2016 incident, Plaintiff continued to send unsolicited e-mails to Dr. Vettraino praising and thanking him for his support.  **Ex. O; E-mails of March 13, 2017, February 15, 2017, January 24, 2017, Ex. JJ.**  Plaintiff's words and actions are incompatible with a claim that she was so distraught by Dr. Vettraino's conduct.  Plaintiff does not even ask to have him removed as her advisor (for alleged "bullying") until May 7, 2017, <u>seven months later</u>

and only after she learned that she had failed her Step 3 exam for the third time, and would not be eligible to be promoted to the next year of residency.  **Ex. W.**  There is simply nothing here to support a claim for any emotional distress caused by Dr. Vettraino.  Plaintiff's alleged emotional distress is from spending ten plus years of her life studying to be a doctor but failing out of the program due to her own shortcomings.

### III.   PLAINTIFF'S CLAIMS UNDER THE ELLIOTT-LARSEN CIVIL RIGHTS ACT SHOULD BE DISMISSED.

#### A.   IPC was not Plaintiff's employer and she cannot bring a claim against it under the ELCRA, or its non-supervisory employee Dr. Vettraino, for hostile work environment.

In *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 697 N.W.2d 851 (2005), *on remand,* 274 Mich. App. 1, 731 N.W.2d 452 (2007), the Michigan Supreme Court held that agents of employers may be liable under the ELCRA: however, an agent, for purposes of the ELCRA must have a "delegation of general supervisory power and authority."  *Elezovic,* 274 Mich. App. at 10.  *See also Vance v. Ball State Univ.*, 570 U.S. 421 (2013) (an employee is a supervisor only if he is the person "empowered by the employer to take a tangible action against the employee which is a significant change in employment status.").  Effective July 1, 2016, Dr. Vettraino stepped down from his role as Associate Program Director and became a mere member of the Core Faculty and was always just an employee (non-owner) of IPC.  **Ex. B, p. 169.**  As mere Core Faculty, Dr. Vettraino had no ability to hire, fire, discipline, or alter any of the terms and conditions of Plaintiff's employment with Trinity.  **Ex. B, p. 185**.  Dr. Vettraino was a teacher and essentially a medical colleague of Plaintiff, not a supervisor as defined by law.  Thus, in October 2016 (the alleged touching) or at any time after July 1, 2016, Dr. Vettraino simply lacked any ability to legally act on behalf of IPC as its agent and cannot be held individually liable under the ELCRA.

Further, Plaintiff was never employed by IPC. **Ex. J. pp. 355, 359.** Plaintiff was always an employee of <u>Trinity</u> pursuant to several employment agreements. **Exs. A, J**; **Ex. I, p. 359.** Plaintiff never received any compensation from IPC. **Ex. I, p. 359.** IPC was simply a third party vendor providing administrative and teaching services (through its physician employees) to Trinity as part of its residency program. **Ex. B, p. 7; Ex. KK.** IPC was never Plaintiff's employer, and Dr. Vettraino was not its agent for purposes of the ELCRA in October 2016 at the time of the alleged touching (and could not affect her terms of employment with Trinity), neither can be liable under the ELCRA.

### B.    Plaintiff cannot establish her prima facie case of hostile work environment.

Even if this Court were to find IPC and/or Dr. Vettraino subject to the ELCRA, to establish a *prima facie* case of hostile work environment harassment, an employee must prove the following by a preponderance of the evidence: (1) she belonged to a protected group; (2) she was subjected to communication or conduct on the basis of sex; (3) she was subject to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile or offensive work environment; and (5) *respondeat superior liability*. *Radtke v. Everett*, 442 Mich. 368, 382-83, 501 N.W.2d 155 (1993).

A hostile work environment claim is actionable only when, in the totality of circumstances, the work is so tainted by harassment that a reasonable person would have understood that the defendant's conduct or communication had either the purpose or effect of substantially interfering with the plaintiff's employment, or subjecting the plaintiff to an intimidating, hostile, or offensive work environment. [6] *Id*. Without even considering prongs (2)-(3), in regard to the fifth element,

---

[6] A single incident of alleged sexual harassment may only create a hostile work environment if it involves an alleged rape or violent sexual assault which is not the case here. Dr. Vettraino

"respondeat superior liability exists when an employer has adequate notice of the harassment and fails to take appropriate corrective action." *Elezovic v. Bennett*, 274 Mich. App. 1, 7, 731 N.W.2d 452 (2007); *Sheridan v. Forest Hills Pub. Schl.*, 247 Mich. App. 611, 621, 637 N.W.2d 536 (2001). An employer <u>must</u> have actual or constructive notice or the alleged harassment before liability will attach to the employer. *Id.* Notice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Chambers v. Trettco, Inc*., 463 Mich. 297, 319, 614 N.W.2d 910 (2000).

Here, it is indisputable that IPC never had notice Plaintiff believed Dr. Vettraino had sexually harassed her or inappropriately touched her. Plaintiff unequivocally admits she never told anyone (except her parents) about the alleged assault until her appeal process before <u>Trinity</u>, which was only <u>after she had been terminated from the residency program</u>. **Ex. I, pp. 231, 232, 239, 284-285, 358**. More specifically, Plaintiff testified she went to her employer, St. Mary's, human resources department in March 2017 to report bullying by <u>other</u> residents, Dr. Meram and Dr. Bhati, but did <u>not make any complaint about Dr. Vettraino's alleged sexual harassment[7] at this or any other time</u>. **Ex. I, p. 254**. Dr. Vettraino's name or the allegations about him were never

---

performing a back exam is not sexual but a learning opportunity. *Radtke,* at 395. See also, *Yost v. Paychex, Inc*., 1998 WL 1989811 (Mich. Ct. App. Sept. 29, 1998) (alleged assault in forcibly kissing plaintiff and touching her breasts was not that rare traumatic experience that could alone, create an offensive or hostile work environment.) **Ex. HH**. Plaintiff alleges a touching of her buttocks during a back exam, two non-sexual comments Dr. Vettraino allegedly made about wanting to date a young or Swedish woman, and that Plaintiff should dress like Melania Trump, all in support of her hostile work environment claim. **Ex. I, 227-228; 232.** These mere four facts are likewise insufficient to create a hostile work environment under element (3) or (4) of a *prima facie* case as they are not severe or pervasive enough to create an environment that a reasonable person would find objectively hostile or abusive. *Radtke*, *supra*.

[7] Although Plaintiff e-mailed Dr. O'Dowd on May 7, 2017 (after she failed Step 3 again) that Dr. Vettraino was a bully and belittled her, this is far from adequate notice of sexual harassment. **Ex. W and Ex. X.**

17

mentioned at any time until after Plaintiff's termination from the residency program. **Ex. I, pp. 231, 358-359**. This is undisputed from Plaintiff's own testimony. Because Plaintiff never told anyone about the alleged touching or any other alleged unwanted (sexual) conduct by Dr. Vettraino until after her termination from the residency program, IPC had no notice and as such, there can be no *respondeat superior* liability. Plaintiff cannot establish a *prima facie* case.

      **C.**    **Plaintiff's claim for quid pro quo sexual harassment fails**.

To establish a claim for quid pro quo harassment, an employee must, by a preponderance of the evidence, demonstrate: (1) she was subject to any of the types of unwelcome sexual conduct or communication described in the ELCRA; and (2) her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment." *Champion v. Nationwide Security, Inc.*, 450 Mich. 702, 708-709, 545 N.W.2d 596 (1996). Plaintiff's claim fails because she offers no evidence of a decision affecting her employment, made by Dr. Vettraino that related to her submission to or rejection of any sexual advance. *Chambers v. Trettco, Inc*., 463 Mich. 297, 313, 614 N.W.2d 910 (2000).

Plaintiff repeatedly admitted at her deposition that no one, including Dr. Vettraino, ever asked her for sex and never linked her continuation in the program or separation from the program to any request for sexual favors:

      Q:     Drs. Vettraino and Patel never asked you for sex, right?

      A:     They did not….

**Ex. I, p. 313; See also Ex. I, p. 227**. When asked "So they didn't make any sexual advances in the form of I want to have sex with you or I want to go to bed with you, right?", Plaintiff stated "No." **Ex. I, p. 314; see also p. 313.** Plaintiff then confirmed, when asked "so they never linked your continuation in the program or your separation from the program to any request for sexual favors, right? ... Plaintiff again stated "No…" **Ex. I, p. 315**. Plaintiff alleges the only sexual

overture to her was when Dr. Vettraino said "I should find a woman half my age" and he should "find a nice Swedish woman" in May 2017. **Ex. I, p. 227-228**. This is far from a sexual advance. By her own admission, Plaintiff was not subject to any unwelcome sexual conduct under circumstances that suggested her continued participation in the residency program would depend on whether she submitted to that conduct. The claim must be dismissed.

## IV.   <u>THE ASSAULT AND BATTERY CLAIMS MUST BE DISMISSED</u>.

"An assault is defined as any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas,* 189 Mich. App. 110, 119, 472 N.W.2d 16 (1991). The intent needed for an assault is the intent to commit a battery or an intent to create in the victim a reasonable fear or apprehension of an immediate battery. *Mitchell v. Daly,* 133 Mich. App. 414, 426, 350 N.W.2d 772 (1984). What Plaintiff is alleging is neither an offer to injure by force or an intent to create a reasonable fear of an immediate battery, and most importantly, as set forth below, there is no evidence Dr. Vettraino intended to create a reasonable fear of an immediate battery.

A battery is defined as "the willful and harmful or offensive touching of another person which results from an act intended to cause such a contact"—the consummation of an assault. *Id.* There is no evidence Dr. Vettraino intended to commit a willful and harmful offensive touching in conducting a back exam on Plaintiff.

Dr. Vettraino testified he had two motives in conducting a back exam on Plaintiff—both educational, not intended to be harmful: (1) to teach her how to do an organized physical exam as this was a deficiency she had been demonstrating in the past; and (2) since she had not been learning or improving her physical exam from what she was learning in textbooks, that going through the exam, and his completing it on her, could help imprint the process. **Ex. D, p. 66**.

19

Plaintiff testified she did not know what Dr. Vettraino was intending to communicate through the back exam.  **Ex. I, pp. 224-225**.  Plaintiff herself testified she believed Dr. Vettraino was going to show her a back exam (albeit in a book that was on the desk). **Ex. I, p. 223**.

As to both, the standard is not what the subjective beliefs of a particular plaintiff were; an objective standard controls.  While offensive to plaintiff, this conduct (as alleged, but denied by Dr. Vettraino) did not equal sexual or any other type of violence.  Even taking the evidence in a light most favorable to Plaintiff, there is simply no evidence Dr. Vettraino intended to commit a battery or create in Plaintiff a reasonable fear or apprehension of an immediate battery.  Plaintiff testified she knew Dr. Vettraino was going to show her a back exam and did not create fear in her before doing so.  *Id.*  Furthermore, Plaintiff's own ongoing praise for Dr. Vettraino in the following months (**Exs. O, JJ**), completely discounts her allegations that this alleged act was harmful, offensive and/or was intended to (or even created) fear in her.  There is no evidence that Dr. Vettraino intended to injure Plaintiff and both the assault and battery claims fail.

## CONCLUSION

Wherefore, for the foregoing reasons, IPC and Dr. Anthony Vettraino respectfully request their Motion for Summary Disposition be granted in its entirety and all the claims against them be dismissed with prejudice.

Date: December 16, 2019                         Respectfully submitted,

 /s/Heather G. Ptasznik
BY: Heather G. Ptasznik (P63344)
OGLETREE, DEAKINS, NASH, SMOAK
 & STEWART, PLLC
Attorneys for Defendants Infinity Primary
 Care, PLLC and Dr. Anthony Vettraino
34977 Woodward Avenue, Suite 300
Birmingham, MI 48009
(248) 723-6124
Heather.Ptasznik@Ogletree.com