**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

HEATHER ELIZABETH HAMOOD,
an individual,

        Plaintiff,

                                  CASE NO. 18-CV-13194

v.

                                    HONORABLE MARIANNE O. BATTANI

                                    MAGISTRATE ANTHONY P. PATTI

TRINITY HEALTH CORPORATION, an Indiana
Non-Profit Corporation, INFINITY PRIMARY CARE, PLLC,
A Michigan Professional Limited Liability Company,
ANTHONY VETTRAINO, an individual,
RAKESH PATEL, an individual, and
DANIEL MERIAM, an individual, Jointly and severally,

        Defendants,

---

## DEFENDANTS TRINITY HEALTH CORPORATION AND DR. PATEL'S MOTION FOR SUMMARY JUDGMENT

      For the reasons set forth in the attached Brief in Support and exhibits, Defendants Trinity Health Corporation and Dr. Patel[1], by and through their undersigned counsel, move for summary judgment on Plaintiff's claims against them in their entirety pursuant to Fed. R. Civ. P. 56(c). Defendants Trinity Health and Dr. Patel respectfully requests dismissal of Plaintiff's Complaint in its entirety because Plaintiff cannot establish a genuine issue of material fact for trial.

      Pursuant to Local Rule 7.1(d), the undersigned contacted Plaintiff's counsel and requested, but did not obtain, concurrence in the relief requested in this Motion.

---

[1] Plaintiff's Complaint also alleged claims against Dr. Daniel Meram, a co-resident. Plaintiff voluntarily agreed to dismiss her claims against Dr. Meram in their entirety. *See* Stipulated Order submitted to Court on November 22, 2019.

Respectfully submitted,

CLARK HILL PLC


By: */s/Carly O. Machasic*
Carly O. Machasic (P75572)
500 Woodward Avenue, Suite 3500
Detroit, Michigan  48226
(313) 965-8464
cmachasic@clarkhill.com
Attorneys for Defendant

Date:  December 16, 2019

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HEATHER ELIZABETH HAMOOD,
an individual,

        Plaintiff,

                                    CASE NO. 18-CV-13194

v.

                                      HONORABLE MARIANNE O. BATTANI

                                      MAGISTRATE ANTHONY P. PATTI

TRINITY HEALTH CORPORATION, an Indiana
Non-Profit Corporation, INFINITY PRIMARY CARE, PLLC,
A Michigan Professional Limited Liability Company,
ANTHONY VETTRAINO, an individual,
RAKESH PATEL, an individual, and
DANIEL MERIAM, an individual, Jointly and severally,

        Defendants,

---

## DEFENDANTS TRINITY HEALTH CORPORATION AND DR. PATEL'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

<u>**CONCISE STATEMENT OF THE ISSUES PRESENTED**</u>

I.   **WHETHER THE HOSPITAL AND DR. PATEL ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT.**

**The Hospital and Dr. Patel State: Yes**
**Plaintiff States: No**

II.   **WHETHER THE HOSPITAL AND DR. PATEL ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR QUID PRO QUO SEXUAL HARASSMENT.**

**The Hospital and Dr. Patel State: Yes**
**Plaintiff States: No**

III.   **WHETHER THE HOSPITAL AND DR. PATEL ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.**

**The Hospital and Dr. Patel State: Yes**
**Plaintiff States: No**

222627177.1

## TABLE OF CONTENTS

INTRODUCTION................................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ...................................................... 2

    THE PARTIES ................................................................................................ 2

    THE HOSPITAL AND THE RESIDENCY PROGRAM PROHIBIT SEXUAL HARASSMENT ............. 4

    PLAINTIFF'S RESIDENCY WITH THE HOSPITAL................................................ 5

    PLAINTIFF'S FIRST YEAR OF RESIDENCY ...................................................... 6

    PLAINTIFF STRUGGLES TO MEET PROGRAM'S EXPECTATIONS FOR SECOND YEAR RESIDENT ................................................................................................ 6

    PLAINTIFF FAILS USMLE STEP III FOR SECOND TIME .................................. 7

    PLAINTIFF TAKES A LEAVE OF ABSENCE TO PREPARE FOR THIRD USMLE STEP III .......... 8

    PLAINTIFF STRUGGLES ON HER REMEDIATION PLAN ................................. 8

    PLAINTIFF COMPLAINS TO HR ABOUT BULLYING BY HER CO-RESIDENTS .......................... 9

    PLAINTIFF FAILS USMLE STEP III FOR THIRD TIME ...................................... 9

    PLAINTIFF IS TERMINATED FROM THE RESIDENCY PROGRAM ......................... 10

    PLAINTIFF APPEALS HER TERMINATION AND ALLEGES SEXUAL HARASSMENT FOR THE FIRST TIME .................................................................................. 10

    PLAINTIFF'S ALLEGATIONS ARE INVESTIGATED AND UNSUBSTANTIATED ..................... 11

    THE ALLEGED "SEXUAL ASSAULT" BY DR. VETTRAINO ............................. 11

    PLAINTIFF'S EVOLVING ALLEGATIONS OF SEXUAL HARASSMENT ........................ 12

LEGAL ARGUMENT ..................................................................................... 13

    PLAINTIFF CANNOT STATE A CLAIM FOR HOSTILE WORK ENVIRONMENT ........... 13

        Neither Dr. Vettraino nor Dr. Patel were Plaintiff's Supervisors ........... 13

        Plaintiff Cannot Show the Hospital Had Any Notice ....................... 15

        Plaintiff Cannot Show the Alleged Conduct was Severe or Pervasive.......... 16

PLAINTIFF CANNOT STATE A CLAIM FOR QUID PRO QUO SEXUAL HARASSMENT ................................................................................................. 18

PLAINTIFF CANNOT SHOW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ........................................................................................................ 19

<u>INDEX OF CONTROLLING AUTHORITIES</u>

<u>CASES</u>

*Blankenship v. Parke Care Centers, Inc.*
  123 F.3d 868 (6th Cir.1997) ................................................................................. 20
*Burlington Industries, Inc. v. Ellerth* 524 U.S. 742 (1998) ....................................... 15
*Burnett v. Tyco Corp.*
  203 F.3d 980 (6th Cir. 2000) ............................................................................... 19
*Carter v. Youth Opportunity Investments,* 2019 WL 1491739 (M.D. Tenn. April 4, 2019) ........ 19
*Clark v. United Parcel Service, Inc.,* 400 F.3d 341, (6th Cir. 2005) ............................ 20
*Dalley v Dykema Gossett, PLLC*
  287 Mich App 296 (2010) ..................................................................................... 22
*Ellerth* 524 U.S. at 761 ........................................................................................... 16
*Equal Employment Opportunity Commission v. AutoZone, Inc.* 692 Fed. Appx. 280 (2017) ...... 16
*Faragher v. Boca Raton,* 524 U.S. 775 (1998) ......................................................... 15
*Harris v. Forklift Sys., Inc.*
  510 U.S. 17 (1993) .............................................................................................. 17
*Hawkins v. Anheuser-Busch, Inc.*
  517 F.3d 321 (6th Cir. 2008) ............................................................................... 17
*Kauffman v. Allied Signal, Inc., Autolite Div.*
  970 F.2d 178 (6th Cir. 1992) ............................................................................... 21
*Knox,* 375 F.3d at 459–60 ........................................................................................ 18
*Kubik v. Central Michigan University Board of Trustees*
  717 Fed. Appx. 577 (6th Cir. 2017) ..................................................................... 19
*Moorer v. Summit Cty. Dep't of Job & Family Servs.*
  2011 WL 2746098, at *1 (N.D. Ohio July 14, 2011) ............................................ 19
*Oncale v. Sundowner Offshore Servs., Inc.*
  523 U.S. 75 (1998) .............................................................................................. 18
*Slayton v Ohio Dep't of Youth Servs*
  206 F.3d 669 (6th Cir. 2000) ............................................................................... 15
*Thornton v. Federal Express Corp.*
  530 F.3d 451 (6th Cir. 2008) ............................................................................... 15
*Vance v. Ball State Univ.*
  570 U.S. 421 (2013) ............................................................................................ 15

222627177.1

# I.   <u>INTRODUCTION</u>

Plaintiff Heather Hamood was a resident physician in the Family Medicine Residency Program at St. Mary Mercy Hospital in Livonia ("The Hospital"). The Hospital terminated Plaintiff's employment after she failed the national licensing exam three times and failed to show required improvement in a remediation program designed to improve her inadequate and unsafe diagnostic and treatment skills. Plaintiff's Complaint alleges hostile environment and quid pro quo sexual harassment under state and federal law against four Defendants: 1) the Hospital, 2) Hospital employee Dr. Rakesh Patel, 3) Infinity Primary Care ("IPC") and 4) IPC's employee Dr. Anthony Vettraino. Plaintiff also asserts claims for intentional infliction of emotional distress against all Defendants and assault and battery against Dr. Vettraino only. The Hospital and Dr. Patel are entitled to summary judgment for several reasons.

First, Plaintiff never raised any allegations of sexual harassment during her employment at the Hospital. In her written appeal after she was terminated, Plaintiff asserted, for the first time, a single allegation against Dr. Vettraino, a non-supervisory preceptor, who was not employed by the Hospital. Plaintiff claimed that Dr. Vettraino "squeezed her buttocks" on one occasion while he was demonstrating on her the proper way to perform a sacroiliac joint examination on a patient complaining of lower back pain. Plaintiff also claimed that Dr. Patel told her during a feedback session that "he would give her his underwear to wipe away her tears." During her deposition in this case, Plaintiff also alleged that Dr. Patel once commented, upon seeing antiseptic foam in Plaintiff's hair, that it reminded him of a scene from the movie "There's Something About Mary."

There is no dispute that Dr. Vettraino and Dr. Patel are not "supervisors" under Title VII. As such, the Hospital cannot be held liable for any alleged sexual harassment under federal or

state law since Plaintiff cannot establish *respondeat superior* liability – that her employer had notice of the alleged harassment and failed to take remedial action upon receiving such notice. Here, Plaintiff admitted that she never reported or gave notice to anyone at the Hospital about the conduct she now claims, after the fact, to constitute sexual harassment. Even if Plaintiff had given notice of this alleged conduct, the alleged comments by Dr. Patel and the back examination by Dr. Vettraino do not meet the "severe" or "pervasive" standard for establishing a claim of hostile environment sexual harassment. Case law makes clear that isolated instances of touching and comments, such as those alleged here, are not sufficient to establish of hostile work environment sexual harassment. Plaintiff also denied that she has evidence of quid pro quo sexual harassment conduct against the Hospital or Dr. Patel. Plaintiff clearly and unequivocally testified that no one ever conditioned any term or condition of her employment on acceptance or rejection of sexual advances toward her. Based on her own testimony, Plaintiff's claim fails as a matter of law. Finally, Plaintiff cannot meet the high threshold to state a claim for intentional infliction of emotional distress. The conduct alleged by Plaintiff to support her claim is not the type of "extreme or outrageous" conduct needed and her claims must be dismissed.

## II.   STATEMENT OF UNDISPUTED FACTS

**The Parties**

Plaintiff Heather Hamood is a former employee of St. Mary Mercy Livonia Hospital ("the Hospital"). Plaintiff was employed by the Hospital as a resident physician in its Family Medicine Residency Program from July 2015 through June 2017. *[Exs. A, J, NN]*[2].

---

[2] Deposition transcripts are attached at Ex. I, Plaintiff (Pl.); Ex. B, Dr. Stacy O'Dowd (SO); Ex. C, Susan Greenwood-Clark (SGC); Ex. D, Dr. Anthony Vettraino (AV); Ex. LL, Dr. Rakesh Patel (RP).

The Hospital is a member of Trinity Health-Michigan d/b/a Saint Joseph Mercy Health System, a health care organization serving six counties in southeast Michigan. Trinity Health-Michigan is part of Trinity Health, one of the largest Catholic health care systems in the nation.

The Hospital has six residency programs. Susan Greenwood-Clark, an employee of the Hospital, is the Director of Graduate Medical Education. *[SGC at 6]*. In her role, Dr. Greenwood-Clark is responsible for the "administrative" functions of the residency programs, including accreditation and regulatory requirements for each program. *[SGC at 12-16]*. Ms. Greenwood-Clark works with the Designated Institutional Officer ("DIO") – the physician director of medical education. Dr. John O'Brien was the DIO. *[SGC at 20-24]*.

The Hospital contracts with Infinity Primary Care ("IPC") and some of its owners and employed physicians to provide educational oversight for the Family Medicine Residency Program. *[SO at 7; Ex. KK]*. IPC is a separate entity and not a part of the Hospital or Trinity Health. *[SO at 7; AV at 14; Ex. KK]*. IPC is a third-party vendor to the Hospital. *[Id.]*. The parties' relationship is codified in an independent contractor agreement. *[SO at 7; Ex. KK]*.

Dr. Stacy O'Dowd was the Program Director of the Family Medicine Residency Program. *[SO at 10, 38-39; AV at 14-15, 21; Ex. KK]*. Dr. O'Dowd is a practicing family physician and an owner of IPC. *[SO at 7]*. Dr. O'Dowd became the Program Director effective July 1, 2015, Plaintiff's first year of residency. *[SO at 10, 38-39; Ex. KK]*. The Program Director, with input from the faculty, "is responsible for making decisions to promote residents to the next level of training in the program and for decisions to graduate residents upon completion of the program." *[Ex. KK; SGC at 63-64]*.

Defendant Dr. Anthony Vettraino was also an employee of IPC. *[AV at 14]*. During the time period relevant to this case, Dr. Vettraino was never an employee of Trinity Health or the

Hospital. *[AV at 14; 30-31].* Prior to July 1, 2015, Dr. Vettraino was the Family Medicine Program Director. *[Ex. KK; AV at 14, 21].* From July 1, 2015 to June 30, 2016, Dr. Vettraino remained Associate Program Director solely to assist Dr. O'Dowd with her transition. *[SO at 185].* After Dr. Vettraino's tenure at Program Director, he was a Core Faculty member and precepted residents during their family medicine office hours. *[AV at 31; SO at 185].* He also served as an advisor and professional mentor to several residents. *[AV at 31-32].* The main role of a faculty advisor is to meet with the residents and review their bi-annual performance evaluations. *[AV at 32].* He had no authority to hire, promote, discipline, or terminate a resident's employment with the Hospital. *[SO at 185; AV at 31, 32, 98; Ex. KK].*

Defendant Dr. Rakesh Patel is an internal medicine physician with privileges at the Hospital. *[RP at 11].* Dr. Patel precepts Family Medicine residents when they are on their required rotation for in-patient family medicine, i.e., "making rounds" at the Hospital. *[RP at 11-14].* Dr. Patel has no leadership or decision-making role within the Family Medicine Residency Program. *[Id.].* He is also not part of the Core Faculty. *[Id.]*

**The Hospital and the Residency Program Prohibit Sexual Harassment**

During orientation, the residents review and receive information regarding both the Hospital and the Graduate Medical Education department's policies on discrimination and harassment, which contain procedures for making a complaint. *[Exs. A, J, CC; SGC at 79-80].* The policies and procedures are also available to residents at any time on their online learning platform, New Innovations. *[Pl. at 99].* Residents have multiple avenues for reporting any concerns, including two options for anonymous reporting through the Hospital's Compliance Line and through the Hospital's patient safety system. *[Ex. CC; SCG at 80].* Plaintiff

acknowledged that she was aware of these policies and that the Hospital took such issues seriously and had zero tolerance for any such reported behavior. *[Pl. at 102-104].*

**Plaintiff's Residency with the Hospital**

Graduating students are typically placed in residency programs located in United States teaching hospitals through the National Resident Matching Program ("the Match Program"). Students typically begin the Match process in September of their final year of medical school and interview throughout the fall. Students and Hospitals rank each other in February. Match results are announced in March and residency programs typically begin in July. *[Pl. at 83-84]*

Plaintiff struggled to meet the requirements needed to continue with a career as a physician. Plaintiff scored in the one percentile on her first and second attempts at the MCAT, the medical school entrance exam. *[Pl. at 35].* Plaintiff scored in the fifth percentile on her third attempt at the MCAT. *[Pl. at 35].* As a result of her scores, Plaintiff was required to apply to a medical school that did not require an MCAT score. *[Pl. at 37].* Plaintiff was accepted by one medical school - the American University of Antigua. *[Pl. at 29, 43].*

Plaintiff completed her clinical rotations in February 2013 and graduated from medical school in the spring of 2014. *[Pl. at 4, 83-84].* Plaintiff struggled to pass her required exams and match with a residency program. Plaintiff first attempted to match in September 2013 *[Pl. at 85].* Plaintiff had thirteen interviews, but failed her USMLE Step II exam during the interviewing season.[3] As a result of her test failure, Plaintiff was withdrawn from the Match Program. *[Pl. at 85, 86].* Plaintiff also failed the USMLE Step I exam on her first attempt. *[Pl. at 89].*

---

[3] All medical students must pass the three-step United States Medical Licensing Exam (USMLE) sponsored by the Federation of State Medical Boards (FSMB) and the National Board of Medical Examiners (NBME). *See* www.usmle.org.

Plaintiff passed her USMLE Step II in March 2014 and entered the Match Program again in September 2014. Plaintiff had four to five interviews. *[Pl. at 87]*. In March 2015, Plaintiff had not matched, meaning that no residency program had accepted her. *[Pl. at 87, 89]*.

After the "main" Match, the Supplemental Offer and Acceptance Program ("SOAP"), also known as "the Scramble," provides an opportunity for unmatched applicants to apply for positions in unfilled programs through a series of short interview rounds. Plaintiff was offered a position at the Hospital in the Family Medicine program through SOAP. *[Pl. at 91]*. Plaintiff had been rejected by the Hospital in the initial Match. *[Pl. at 91-92]*. The Hospital was the only program that offered Plaintiff a spot in a residency program. *[Id.]*.

**Plaintiff's First Year of Residency**

The residency program and Plaintiff's employment with the Hospital began on July 1, 2015. *[Pl. at 95, Ex. A]*. During the first year, residents are generally expected to observe and show enthusiasm for learning, rather than independently treat patients. *[SO at 32-34, 54; AV at 50-51; RP at 31]*. Plaintiff passed all of her first year rotations, but her preceptors noticed deficiencies and had concerns about her history taking and physical examination skills. *[Exs. E, F; AV at 44-45, 49; RP at 31, 32]*. Plaintiff admitted that she had no issues with Dr. Vettraino during her first year. *[Pl. at 121]*. Plaintiff also had limited interaction with Dr. Patel. *[Pl. at 123]*. He was only the preceptor on Plaintiff's two-week in-patient rotation. *[Pl. at 122-125]*.

**Plaintiff Struggles to Meet Expectations for Second Year Resident**

Despite showing weaknesses in her first year, the program leadership believed Plaintiff could improve and progress to her second year of residency. Plaintiff was offered and accepted a contract for her second year. *[Ex. J]*. Second year residents are given more patient responsibility and expected to treat patients with more independence. *[SO at 54; AV at 50-51]*. As a result,

throughout Plaintiff's second year of residency, Plaintiff's significant clinical deficiencies became readily apparent. *[Ex. K, L]*. Almost every family medicine physician she worked with noted significant deficiencies with Plaintiff's skills during her second year. *[Ex. K, L, M, N, DD]*.

Later in November 2016, Plaintiff was required to a complete a two-week in-patient family medicine rotation in the Hospital. Dr. Patel and Dr. Mark Michaels were the two physician preceptors on the rotation. Plaintiff also shared shifts with one of the chief third-year residents, Dr. Daniel Meram. *[Pl. at 182-189; RP at 15; Exs. M, N, DD]*.

All of the higher level physicians, including Drs. Shailesh, Meram, Patel and Michaels shared concerns that Plaintiff was unsafe and incompetent to treat patients during her in-patient rotation. *[Pl. at 187]*. As a result, Plaintiff failed the rotation. *[Ex. M, N, DD]*. At the same time, Plaintiff's clinic preceptors, including Dr. O'Dowd, Dr. Vettraino, and Dr. Faulkenberg were increasingly concerned about Plaintiff's ability to safely and effectively treat patients. *[Ex. DD]*.

During her deposition, Plaintiff acknowledged the deficiencies in her performance and that she had received this feedback from almost every family medicine physician she worked with during the second year. *[Pl. at 187, 208]*. However, Plaintiff believes that Dr. Daniel Meram and another third year resident, Dr. Mona Bhatti, began a "conspiracy" against her with Dr. Vettraino because they were "jealous" of her positive evaluations. *[Pl. at 155-169]*.

**Plaintiff Fails USMLE Step III for Second Time**

Plaintiff's contract with the Hospital also required her to pass the USMLE Step III by March 1 of her second year to be eligible for promotion to the third year of her residency. *[Pl. at 142; Ex. J]*. The State of Michigan limits the total number of times an applicant may attempt to pass any part of the USMLE to three attempts. Plaintiff testified that she knew she would be "out of the program" if she did not pass Step III by July 1, 2017. *[Pl. at 142]*.

7

Plaintiff took the USMLE Step III in December 2015.  Plaintiff failed. *[Pl. at 140-141].* Plaintiff testified that she considered leaving the residency program because of her Step III failure in December 2015. *[Pl. at 141].* Plaintiff took the USMLE Step III again in 2016. She failed again. She received her scores in November 2016 and believed that her second failing test score was "hacked" because she received a corrupted email reporting her score. *[Pl. at 205-206; Ex. NN].* Plaintiff reported the hack to the NBME and the state and federal police. All entities to which Plaintiff has reported the alleged "hack" have independently investigated and found no merit to Plaintiff's allegation. *[Pl. at 274, 275; Ex. PP].*

**Plaintiff Takes a Leave of Absence to Prepare for Third USMLE Step III**

On December 19, 2016, Plaintiff took a two-month leave of absence to study for her third attempt at the Step III exam. *[Pl. at 240].* Plaintiff's expected return date was February 13, 2017. *[Ex. P].* Plaintiff knew that if she did not pass the exam, she could not continue in the residency program. *[Pl. at 241].* Plaintiff testified that she was "grateful" for the leave and that Dr. O'Dowd was "wonderful" during her time of need. *[Pl. at 241-242, 247].* She also stated that Dr. Vettraino, her mentor, was extremely supportive. *[Pl. at 243, 248; Ex. O].*

**Plaintiff Struggles on Her Remediation Plan**

When she went out on leave in December 2016, Plaintiff also knew that she was struggling in the residency program and would be on a remediation plan when she returned. *[Pl. at 250].* Plaintiff ended up requesting an extension of her leave and ultimately returned on March 13, 2017 beginning her remediation plan. *[Ex. O].* Plaintiff received critical evaluations from each of her preceptors, including observations that her diagnosis was "not supported by physical findings," that she has made "no progress in physical exam skills," and that she was "overall not performing at a second year resident." *[Pl. at 252; Exs. Q, T, U].*

**Plaintiff Complains to HR About Bullying by her Co-Residents**

On March 29, 2017, Plaintiff complained to Ben Carravallah in the Hospital's Human Resources that she was bullied and harassed by senior residents Drs. Bhatti and Meriam. *[Ex. OO].* Plaintiff told Mr. Carravallah that she believed Drs. Bhatti and Meram were influencing attending physicians to fail some of her rotations. *[Pl. at 254].* In Plaintiff's written complaint and interview with Mr. Carravallah, Plaintiff complained about several residents and several preceptors, including Dr. Patel and Dr. Michaels. *[Pl. at 254].* Plaintiff never complained about any type of sexual harassment or discrimination by anyone. *[Ex. OO].* Nor did Plaintiff make any complaint whatsoever about Dr. Vettraino. *[Pl. at 257].*

**Plaintiff Fails USMLE Step III for Third Time**

On May 3, 2017, Plaintiff learned that she failed the USMLE Step III for a third time. *[Pl. at 270].* As a result, Plaintiff knew she would not be able to continue in the Hospital's residency program and would never be able to practice medicine in the State of Michigan. *[Pl. at 270, 273; Ex. J, S].* That day, Plaintiff and her father showed up without notice at Dr. Vettraino's office in Livonia. *[Pl. at 275].* Plaintiff and her father then drove to the Canton clinic and approached Dr. O'Dowd at her office. While Plaintiff and her father were waiting for Dr. Vettraino, a medical assistant overheard Plaintiff threaten Dr. Vettraino by saying: "I'm well-connected in the acting world. They don't want me taking this to the media." *[Ex. QQ].* Plaintiff, trying to find an excuse for her failure, again claimed her score on this USMLE exam was hacked. *[Ex. X].* Plaintiff's father was hostile with Dr. Vettraino and Dr. O'Dowd and told them that he was going to "press charges" and "sue Drs. Bhatti and Dr. Meram." *[Pl. at 276-277].* Notably, neither Plaintiff nor her father said anything to Dr. Vettraino or Dr. O'Dowd about any alleged sexual harassment.

9

After these meetings, Plaintiff requested to be transferred to another mentor. *[Pl. at 283-285; Exs. W, X]*. Plaintiff complained to Dr. O'Dowd that Dr. Vettraino "was critical" and "belittled" her. *[Id.]*. Again, neither Plaintiff nor her father mentioned anything about sexual harassment, despite telling Dr. O'Dowd she had been like a "second mother" to her. *[Ex. QQ]*.

## Plaintiff is Terminated from the Residency Program

By late May 2017, Plaintiff had unequivocally failed on all aspects of her remediation plan. The family medicine faculty members were more and more concerned about Plaintiff's ability to safely treat patients. Moreover, as a result of her third USMLE Step III failure, Plaintiff was unable to ever advance to the third year of her residency. On May 23, 2017, Dr. O'Dowd wrote to Susan Greenwood-Clark and Dr. O'Brien recommending Plaintiff's termination from the residency program. *[Ex. MM]*. They accepted Dr. O'Dowd's decision without issue. On June 13, 2017, Plaintiff was terminated from the residency program and her employment with the Hospital ended on June 26, 2017. *[Ex. RR]*.

## Plaintiff Appeals Her Termination and Alleges Sexual Harassment for the First Time

On July 20, 2017, Plaintiff appealed her termination from the program. *[Ex. SS]*. In this appeal, Plaintiff, for the first time, alleged that Dr. Vettraino "squeezed her buttocks without consent" while he was "showing her a back maneuver regarding a patient on the sacroiliac joint." *[Ex. SS]*. This was weeks after her termination and over eight months after the alleged incident occurred. *[Pl. at 231-232, 298-299, 358-359; Ex. SS]*. Although Plaintiff had gone to Trinity's Human Resources department in March 2017 to complain only about co-residents Dr. Bhatti and Dr. Meram's bullying, at no time did she tell anyone, prior to her termination, that Dr. Vettraino had inappropriately touched her or sexually harassed her. *[Pl. at. 253-254, 284-285]*. In fact, until May 2017, Plaintiff had only praised and confided in Dr. Vettraino, although she was

10

critical of her other preceptors. Even when she did complain about Dr. Vettraino, she indicated that he had "been critical" and "bullied" her. *[Exs. W, X].* Plaintiff's appeal also alleged that Dr. Patel was "abusive and overly critical" of her. *[Ex. SS].* Plaintiff, for the first time, also stated that Dr. Patel said he "could give her his underwear to wipe away her tears." *[Ex. SS].*

## Plaintiff's Allegations are Investigated and Unsubstantiated

Even though Plaintiff had already been terminated from the residency program, the Hospital took the allegations contained in Plaintiff's appeal seriously. On August 3, 2017, Mr. Carravallah met with Dr. Vettraino and Dr. Patel separately to discuss the allegations against them contained in Plaintiff's appeal. *[Ex. TT].* Both physicians vehemently denied any wrongdoing and Mr. Carravallah found that that they both gave credible accounts regarding the events at issue. As a result, he found Plaintiff's allegations to be unsubstantiated. *[Ex. TT].*

## The Alleged "Sexual Assault" by Dr. Vettraino

Importantly, Dr. Vettraino acknowledged that he performed a sacroiliac examination on Plaintiff. Plaintiff and Dr. Vettraino have similar recollections of this event. Plaintiff alleges that on October 26, 2016, she was seeing patients with Dr. Vettraino at the IPC Livonia clinic. *[Pl. at 210].* The last patient of the day presented with pain in the sacroiliac area of the back. *[Pl. at 211].* As a result, Plaintiff performed a sacroiliac examination, which involves palpating the lower region of the spine.

Dr. Vettraino observed that Plaintiff had incorrectly performed the exam because she did not perform the back exam in an organized manner and did not apply enough force or pressure. *[AV at 66].* After seeing the patient, Dr. Vettraino and Plaintiff went to the precepting room to discuss the patient and Plaintiff's examination. *[Pl. at 223; AV at 66].* According to Plaintiff, Dr. Vettraino asked Plaintiff to turn around and told Plaintiff "I'm going to show you the exam." *[Pl.*

11

*at 222-224].* Plaintiff testified that she thought he was going to "show" her in one of the musculoskeletal books. *[Id.].* Plaintiff stated that the exam was brief and that she left the room afterwards. *[Pl. at 225-226].* Plaintiff admits that she did not say anything and Dr. Vettraino did not say anything to her afterwards. Nor did he ever touch her again. *[Pl. at 227].* Plaintiff never told anyone, except her parents, until after her termination nearly a year later. *[Pl. at 231-232].*

**Plaintiff's Evolving Allegations of Sexual Harassment**

Since making her initial complaint against Dr. Vettraino in her post-termination appeal, Plaintiff's allegations against him have evolved. During her deposition, Plaintiff, for the first time, claimed that Dr. Vettraino said in her presence that: 1) he should "find a woman half my age"; 2) he "should go find a nice Swedish woman"; 3) Plaintiff should "dress up as Melania for Halloween." *[Pl. at 227].* Plaintiff also claims that Dr. Vettraino would "get erections" in front of her and other women. When asked how she knew that Dr. Vettraino had an erection, Plaintiff claimed that she would see him shift in his chair when she and other women walked into meetings. *[Pl. at 229].* Plaintiff admitted she had never documented any of these allegations despite dozens of pages of contemporaneous and handwritten personal notes. *[Id.].*

During her deposition, Plaintiff, also for the first time, also claimed Dr. Mark Michaels sexually harassed her during an eye exam with a patient when he told her and the male patient "we're setting the stage." *[Pl. at 190-191].* Plaintiff also admitted she never complained to anyone about this alleged incident. *[Pl. at 192].*

This lawsuit is also the first time Plaintiff alleged a claim of sexual harassment against Dr. Patel. She bases her claim on two alleged comments: 1) that on one occasion in July 2015, Dr. Patel commented that she reminded him "of Cameron Diaz in There's Something about Mary" when she accidentally got some antiseptic foam in her hair; and 2) that during her second

year, Dr. Patel told her "you can use my underwear to wipe your tears" when she was crying in the hallway. *[Pl. at 126]*. It is undisputed that Plaintiff never complained to anyone at the Hospital about the two alleged comments from Dr. Patel. *[Pl. at 127]*. Plaintiff testified that she "brushed off" the comments and had no other issues with Dr. Patel. *[Pl. at 127]*.

## LEGAL ARGUMENT

**A.**    **PLAINTIFF CANNOT STATE A CLAIM FOR HOSTILE WORK ENVIRONMENT**

To establish a *prima facie* case of hostile environment sexual harassment against the Hospital or Dr. Patel, Plaintiff must show that: (1) she belonged to a protected group, (2) she was subjected to communication or conduct on the basis of sex, (3) she was subjected to unwelcome sexual conduct or communication, (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with her employment or create an intimidating, hostile or offensive work environment, and (5) a basis for liability. *Thornton v. Federal Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008); *Chambers*, *supra* at 311. An employer may only be liable for harassment by nonemployees if it tolerates a discriminatory environment and fails to take steps to remedy known discrimination. *Slayton v Ohio Dep't of Youth Servs*, 206 F.3d 669 (6th Cir. 2000). Plaintiff must show that "the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *See Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013).

### 1.    **Neither Dr. Vettraino nor Dr. Patel were Plaintiff's Supervisors**

If the alleged harasser is a co-worker or third-party, the employer is only liable if it had notice of the alleged harassment, yet failed to take appropriate corrective action. *See Vance*, 570 U.S. at 424 analyzing *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742 (1998) and *Faragher v.*

13

*Boca Raton*, 524 U.S. 775 (1998). Only if the alleged harasser is the employee's "supervisor," may the employer be held vicariously liable even if it has no prior notice. *Id.*

Under Title VII, the definition of "supervisor" is narrow. An employee is a "supervisor" only if he or she is "empowered by the employer to take tangible employment actions against the complaining employee." *Id.* A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 429 quoting *Ellerth*, 524 U.S. at 761. The "ability to influence" the ultimate decision-maker ability or to direct or critique another employee's tasks does not turn an individual into a "supervisor." *See Vance,* 570 U.S. at 439. Nor does the "ability to conduct performance evaluations." *See Equal Employment Opportunity Commission v. AutoZone, Inc.,* 692 Fed. Appx. 280 (2017).

Here, it is undisputed that neither Dr. Vettraino nor Dr. Patel was empowered by the Hospital to promote, fire or take any other tangible employment action against Plaintiff:

> **Q.** ...Dr. O'Dowd, do any of the core faculty or faculty members have the authority to hire, fire, discipline, or otherwise affect the terms and conditions of the resident's employment relationship?
>
> **A.** No, they're not able to do that. *[SO at 185].*

The record is clear that such authority rested with the Program Director – Dr. O'Dowd and the DIO – Dr. O'Brien. *See Ex. KK; MM; SGC at 63-64; AV at 31-32, 98; RP at 11-12, 18, 19, 64, 72.* It is undisputed that neither Dr. Patel nor Dr. Vettraino had any authority to make decisions regarding her hire, her advancement in the residency program or her ultimate termination. Dr. Patel acted only as a preceptor on Plaintiff's in-patient Hospital medicine rotation. He had limited interaction with Plaintiff and was not part of the Core Faculty for the Program. Dr. Vettraino was an employee of IPC, a third-party vendor of the Hospital. Dr. Vettraino held no

14

leadership position within the residency program during Plaintiff's tenure. He served as a professional colleague, mentor and preceptor to Plaintiff when she saw patients at IPC's offices, until Plaintiff requested that he be removed even from those roles prior to her termination. The Hospital had not vested either with the requisite authority to be "supervisors" under Title VII. As a result, the Hospital cannot be held liable for their alleged conduct and Plaintiff's claims must be dismissed.

Dr. Patel and Dr. Vettraino's ability to provide input into her remediation plan is inconsequential. Neither turns an individual into an employee's supervisor for purposes of liability for hostile work environment harassment. Courts have found that employees with far more authority and control over a plaintiff's employment **were not** "supervisors" for purposes of employer liability under Title VII. *See Autozone*, 692 Fed. Appx. at 283-284 (Company not liable for alleged sexual harassment where alleged harasser oversaw the plaintiff's day-to-day work, could initiate discipline and could recommend demotion or promotion but district manager who visited the store once a week, actively participated in management and regularly interacted with the store's employees was the individual with the ultimate authority to promote or fire the plaintiff); *see also Wierengo v. Akal Sec. Inc.,* 580 Fed. Appx. 364 (6th Cir. 2014)(site supervisor, lead security office and security officer who could not take "tangible employment actions against the plaintiff were not supervisors).

### 2.    Plaintiff Cannot Show the Hospital Had Any Notice

Plaintiff also cannot show a basis for employer liability for the alleged conduct of Drs. Patel and Vettraino under the co-worker or third-party standard. To hold an employer liable for harassment by a co-worker or third party, a plaintiff is required to show the employer acted indifferently or unreasonably in light of the surrounding facts. This is a high threshold. "..[W]hen

15

an employer responds to charges of sexual harassment, **the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known**. The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment. *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872 (6th Cir.1997).

Here, it is undisputed that the Hospital never had any knowledge about any of the alleged sexual harassment by Drs. Patel and Vettraino. At her deposition, Plaintiff readily admitted she never told anyone at the Hospital or anyone associated with the residency program about these alleged incidents. The first time she made these allegations was in her termination appeal in July 2017 – over two months after she had been separated from the residency program. Because the Hospital had absolutely no knowledge, it could not have done anything in response. As a result, Plaintiff cannot show any basis for employer liability.

### 3.     Plaintiff Cannot Show the Alleged Conduct was Severe or Pervasive

"To determine whether a work environment is 'hostile' or 'abusive,' courts look at the totality of the circumstances." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (citations omitted). Courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Thornton*, 530 F.3d at 455 quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "The factfinder must evaluate the conduct at issue by both an objective and subjective standard," and that "requires a plaintiff to establish both that the harassing behavior was 'severe or pervasive' enough to create an environment that a reasonable person would find objectively hostile or abusive, and that he or

16

she subjectively regarded the environment as abusive." *Id.* "Isolated incidents (unless extremely serious)" are not enough. "Conduct must be extreme." *See Faragher*, 524 U.S. at 788.

Plaintiff alleges two incidents of sexual harassment by Dr. Patel: 1) that he told Plaintiff she reminded him of a scene in the movie "There's Something about Mary" when she got antiseptic foam in her hair and 2) that he told her she could "use his underwear to wipe her tears" when she was crying in the hallway. These two comments are not sufficiently "severe" or "pervasive" to meet the threshold for sexual harassment. On their face, these comments are not sexual in nature or even offensive, let alone "extreme." Plaintiff's allegation that Dr. Michaels sexually harassed her during an eye exam with a patient when he told her and the male patient "we're setting the stage" is even further innocuous and is insufficient to meet the "severe or pervasive" standard. Plaintiff cannot state a claim for hostile work environment harassment based on these alleged comments. *See e.g. Knox,* 375 F.3d at 459–60 (holding that various comments and foul language were not severe or pervasive); *see also Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998) (holding that plaintiffs must prove more than that a comment was tinged with offensive sexual connotations).

Plaintiff's allegations regarding Dr. Vettraino also do not meet the standard. Although Plaintiff characterizes the sacroiliac exam performed by Dr. Vettraino as "sexual assault," nothing about this situation is sexual, lewd, or even remotely offensive. Plaintiff was a medical resident learning about bodily functions and how to properly and safely perform medical examinations. Plaintiff herself admits that in this instance, Dr. Vettraino asked her to turn around so that he could "show" her the exam, which she herself had just performed minutes earlier on a male patient. This was a legitimate teaching opportunity. There are no facts to indicate that this exam was a sexual overture at Plaintiff. Plaintiff does not allege that Dr. Vettraino made any

17

sexually suggestive comments, propositioned her for sex or dates, or otherwise acted inappropriately toward her based on her sex that day or at any time during her employment with the Hospital.[4] Looking at the totality of the circumstances, no reasonable juror could find that the sacroiliac examination was an offensive touching, let alone an extreme isolated incident akin to rape or gruesome sexual assault sufficiently severe to give rise to a hostile work environment claim. Other courts interpreting Title VII have found far worse conduct to be legally insufficient to create a hostile work environment. *See e.g. Carter v. Youth Opportunity Investments,* 2019 WL 1491739 (M.D. Tenn. April 4, 2019) ("single slap on her rear end" with a key strap not enough to create hostile work environment); *Kubik v. Central Michigan University Board of Trustees*, 717 Fed. Appx. 577 (6th Cir. 2017)(citing cases of "extreme examples of workplace harassment" that did not meet the standard for hostile work environment."); *Burnett v. Tyco Corp.,* 203 F.3d 980, 983 (6th Cir. 2000)(manager's actions over a six-month period, which included putting pack of cigarettes under the plaintiff's shirt and bra strap, making a comment about the plaintiff's "cherry" and saying "dick the malls, dick the malls, I almost got aroused," were insufficient to create hostile work environment).

## III.   PLAINTIFF CANNOT STATE A CLAIM FOR QUID PRO QUO SEXUAL HARASSMENT

To establish a claim for quid pro quo sexual harassment, an employee must show that 1) she was a member of a protected class; 2) she was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was based on sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to

---

[4] Plaintiff's allegations, made for the first time at her deposition, that Dr. Vettraino made comments about "finding women" or that he would "get erections" in front of her and other women are similarly vague and cannot support her claim.

the supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of respondeat superior liability. *See Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 186 (6th Cir. 1992).

Here, Plaintiff admits that she was never subject to unwelcome sexual advances or requests for sexual favors by anyone at the Hospital or associated with the residency program. Plaintiff repeatedly testified that no one ever asked her for sex or ever conditioned her continuation in the residency program to any sexual advances or requests for sexual favors:

> Q. Drs. Vettraino and Patel never asked you for sex, right?
> A. They did not. *[Pl. at 313].*
> *       *       *
> Q. And Dr. Patel never requested sex, right?
> A. No.
> Q. So they never linked your continuation in the program to any request for sexual favors, right?
> A. No.
> Q. I'm correct?
> A. That's correct. *[Pl. at 315].*

Based on her admissions, her claims against the Hospital and Dr. Patel fail as a matter of law.

Even if Plaintiff had alleged or could show a quid pro quo sexual harassment, an employer and its agents can only be liable if the employer fails to take prompt and adequate remedial action after having been put on notice of the harassment. *Id.* As stated in detail above, Plaintiff admitted that she never made anyone at the Hospital aware of any allegations of sexual harassment during her employment. As a result, Plaintiff cannot meet her burden and her claims fail as a matter of law.

## IV.   PLAINTIFF CANNOT SHOW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To establish a *prima facie* case of intentional infliction of emotional distress, Plaintiff must present evidence of (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress of Plaintiff. Plaintiff must demonstrate that the

19

Hospital and/or Dr. Patel's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not give rise to liability for intentional infliction of emotional distress. *Dalley v Dykema Gossett, PLLC*, 287 Mich App 296, 321 (2010).

As to Plaintiff's claim against the Hospital, it is undisputed that Plaintiff never told anyone at the Hospital about any alleged sexual harassment, or even wrongdoing, until after she was separated from the residency program. The Hospital cannot act "intentionally" if it has no notice or knowledge of the conduct. As to Plaintiff's claim against Dr. Patel, Plaintiff only alleges that Dr. Patel made two isolated statements to her regarding the movie "There's Something about Mary" and about "wiping away her tears with his underwear." Even if true, these allegations do not rise to the "extreme and outrageous" level required to state a claim for intentional infliction of emotional distress. *See e.g. Yost v. Paychex, Inc.,* 1998 WL 1989811 (Mich. Ct. App., Sept. 29, 1998) (alleged touching of breast, a forceful kiss, and one comment in a hot tub, not sufficient); *Lan Nguyen v. GMC,* 2006 U.S. Dist. LEXIS 60088 (W.D. Mich. 2006) (series of repulsive sexual comments and alleged kissing not sufficient). There is absolutely no basis for a claim of intentional infliction of emotional distress against the Hospital or Dr. Patel.

Respectfully submitted,

CLARK HILL PLC

By: */s/Carly O. Machasic*
Carly O. Machasic (P75572)
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226
(313) 965-8464
cmachasic@clarkhill.com
Attorneys for Defendant

Date: December 16, 2019

20

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 16, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

*s/Carly O. Machasic*
Carly O. Machasic (P75572)
cmachasic@clarkhill.com

222627177.1