## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

HEATHER ELIZABETH HAMOOD,
an Individual,

                          Plaintiff,

v.

TRINITY HEALTH CORPORATION,
INFINITY PRIMARY CARE, PLLC,
ANTHONY VETTRAINO, RAKESH PATEL,
and DANIEL MERAM, jointly and severally,

                      Defendants.

Case No. 18-cv-13194

Judge Marianne O. Batttani

---

### PLAINTIFF'S RESPONSE TO DEFENDANTS' TRINITY HEALTH CORPORATION AND RAKESH PATEL'S MOTION FOR SUMMARY JUDGMENT

        NOW COMES the Plaintiff, HEATHER ELIZABETH HAMOOD, by and through her attorneys, Pear Sperling Eggan & Daniels, P.C., and for her Response to Defendants Trinity Health Corp. and Rakesh Patel's Motion for Summary Judgment, and for the reasons set forth in the attached Brief In Support of this Response, hereby respectfully requests that this Honorable Court DENY Defendants' Motion.

                      Respectfully Submitted,

Dated:  January 28, 2020        BY:   /s/ Jeremy C. Kennedy (P64821)
                                 Jeremy C. Kennedy (P64821)
                              Attorneys for Defendant/Counter-Plaintiff
                              24 Frank Lloyd Wright Drive, Ste D-2000
                              Ann Arbor, MI  48105
                              (734) 665-4441
                              jkennedy@psedlaw.com

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN**

HEATHER ELIZABETH HAMOOD,
an Individual,

                             Plaintiff,

v.

TRINITY HEALTH CORPORATION,
INFINITY PRIMARY CARE, PLLC,
ANTHONY VETTRAINO, RAKESH PATEL,
and DANIEL MERAM, jointly and severally,

                             Defendants.

Case No. 18-cv-13194

Judge Marianne O. Batttani

---

**PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE
TO DEFENDANTS' TRINITY HEALTH CORPORATION AND
RAKESH PATEL'S MOTION FOR SUMMARY JUDGMENT**

**Respectfully submitted by:
Pear Sperling Eggan & Daniels, P.C.
BY:  Jeremy C. Kennedy (P64821)
24 Frank Lloyd Wright Dr., Suite D-2000
Ann Arbor, Michigan  48105**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

CONTROLLING AUTHORITY ............................................................................... vi

COUNTER STATEMENT OF QUESTIONS ............................................................ vii

INTRODUCTION AND POSITION OF PLAINTIFF ................................................. 1

STANDARD OF REVIEW ..................................................................................... 2

COUNTER STATEMENT OF FACTS ..................................................................... 2

    I.   Dr. Hamood Begins Her Residency at St. Mary Mercy Hospital ................ 2

    II.  Dr. Hamood Begins Her Second Year of Residency ................................... 4

    III. Dr. Hamood is Sexually Assaulted by Dr. Vettraino ................................. 4

    IV. Dr. Hamood Begins to Be Penalized by the Family Medicine Department ...... 6

    V.  Dr. Hamood is Placed on Remediation and Terminated .............................. 7

    VI. The Appeal Hearing ............................................................................... 9

ARGUMENT ........................................................................................................ 10

    I.   SEXUAL HARASSMENT CLAIMS ......................................................... 10

        A. Dr. Hamood Has Established the Existence of a Hostile Work Environment ...... 10

        B. General Policies for Federal Title VII Claims ...................................... 12

        C. General Provisions of the Elliot-Larsen Civil Rights Act ..................... 13

        D. Dr. Hamood Has Presented Evidence of a Quid Pro Quo ...................... 15

            1. State Claims ................................................................................ 15

            2. Title VII Quid Pro Quo Sexual Harassment ................................. 16

        E. *Respondeat Superior* Can Be Shown ................................................... 17

        F. Relations Between Hamood, Trinity Health and Infinity Primary Care ...... 18

    II.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ...................... 19

III.   CONCLUSION AND RELIEF SOUGHT ........................................................................   20

INDEX OF EXHIBITS

CERTIFICATE OF SERVICE

## **TABLE OF AUTHORITIES**

**CASES**

*Abeita v. Transam. Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir. 1998).....................................11

*Banta* v. *United States*, 434 U.S. 819 (1977)........................................................................13

*Burns v McGregor Electronic Industries, Inc.*, 955 F2d 559, 565 (8th Cir., 1992) ...............15

*C Thorrez Industries, Inc v Civil Rights Comm*, 88 Mich. App. 704, 708 (1979)....................14

*Cariddi* v. *Kansas City Chiefs Football Club*, 568 F.2d 87, 88 (8th Cir., 1977).....................13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................2

*Compston* v. *Borden, Inc.*, 424 F. Supp. 157 (SD Ohio 1976) ................................................13

*Downer v Detroit Receiving Hosp*, 191 Mich. App 232, 234 (1991) .....................................17

*Downes v. Federal Aviation Administration*, 775 F.2d 288, 291-92 (Fed. Cir. 1985) ..........16

*Elezovic v. Ford Motor Co.*, 472 Mich. 408, 426 (2005) .......................................................17

*Firefighters Institute for Racial Equality* v. *St. Louis*, 549 F.2d 506, 514-515 (8th Cir.) ......13

*General Electric Co*. v. *Gilbert*, 429 U.S. 125, 141-142 (1976) .............................................12

*Graham v Ford*, 237 Mich. App. 670, 674 (1999) .............................................................8, 19

*Griggs* v. *Duke Power Co*., 401 U.S. 424, 433-434 (1971)....................................................12

*Hall v Gus Construction Co., Inc.*, 842 F2d 1010, 1014 (8th Cir., 1988) ..............................15

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)...............10, 11

*Hartleip v. McNeilab, Inc.*, 83 F.3d 767 (6th Cir. 1996) .......................................................15

*Henson v Dundee*, 682 F.2d 897, 909 (11th Cir., 1982) ...................................................16, 18

*Highlander v. K.F.C. Nat'l Management Co.*, 805 F.2d 644 (6th Cir. 1986) .......................16

*Hill v. BASF Wyandotte Corp*., 27 F.E.P. Cases 66, 71 (E.D. Mich. 1981) .........................16

*Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) ....................................10, 11

*Katz v. Dole*, 709 F.2d 251, 255 n.6 (4th Cir. 1983)......................................................16, 18

*Knox v. Neaton Auto Prods Mfg., Inc.*, 375 F.3d 451, 459-60 (6th Cir 2004)........................................11

*Linebaugh v. Sheraton Mich. Corp.*, 198 Mich. App. 335 (1993)..........................................................19

*McCarthy v State Farm Ins Co.*, 170 Mich. App. 451, 457 (1988)..................................................17, 18

*McClements v. Ford Motor Co.*, 473 Mich. 373 (2005)........................................................................18

MCL 37.2103(h) .....................................................................................................................................15

*Miller v C A Muer Corp*, 420 Mich. 355, 363 (1984)......................................................................14, 16

*Miller v. Bank of America*, 600 F.2d 211, 213 (9th Cir. 1979)............................................................16

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998,
   140 L. Ed. 2d 201 (1998) ...................................................................................................................11

*Radtke v. Everett,* 442 Mich. 368 (1993) ........................................................................................5, 14

*Selk v Detroit Plastic Products*, 419 Mich 1, 9; 345 NW2d 184 (1984) .............................................14

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ...........................................................................12

*Teadt v. St. John's Evangelical Church*, 237 Mich. App. 567 (1999)..................................................19

*Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016)................................................2

**STATUTES**

MCL 37.2202(1)(a)..................................................................................................................................14

Michigan Civil Rights Act, Mich. Comp. Laws § 37.2101 et seq...........................................................13

**OTHER AUTHORITIES**

§1604.11(a)(3) ........................................................................................................................................12

29 CFR § 1604.11(a) (1985)....................................................................................................................12

42 U.S.C. § 2000e(b) ..............................................................................................................................16

House Legislative Second Analysis, HB 4407, August 15, 1980............................................................15

**FEDERAL AUTHORITY**

45 Fed. Reg. 74676 (1980) ............................................................................................13

*Rogers* v. *EEOC*, 454 F.2d 234 (5th Cir. 1971)..........................................................13

Rule 56(c)..................................................................................................................5, 2

<u>**CONTROLLING AUTHORITY**</u>

<u>**Summary Judgment Under Rule 56(c)**</u>

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)


<u>**Elliot-Larsen Civil Rights Act Claims**</u>

*Radtke v. Everett,* 442 Mich. 368 (1993)


<u>**Title VII Hostile Work Environment Sexual Harassment Claims**</u>

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)

*Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)


<u>**Title VII Quid Pro Quo Sexual Harassment Claims**</u>

*Highlander v. K.F.C. Nat'l Management Co.*, 805 F.2d 644 (6th Cir. 1986)


<u>**Intentional Infliction of Emotional Distress**</u>

*Graham v Ford*, 237 Mich. App. 670, 674 (1999)

## <u>COUNTER STATEMENT OF QUESTIONS</u>

**WHERE THE PLAINTIFF HAS SHOWN THAT THE WORK ENVIRONMENT WAS HOSTILE AND ABUSIVE TOWARDS HER AS A RESULT OF HER SEX, SHOULD SUMMARY JUDGMENT BE DENIED ON HER CLAIMS OF SEXUAL HARASSMENT?**

**Plaintiff Answers: Yes**

**The Court Should Answer: Yes**

## <u>INTRODUCTION AND POSITION OF PLAINTIFF</u>

For years, Dr. Heather Hamood worked diligently towards her goal of becoming a doctor, overcoming obstacles with hard work and persistence. She graduated *cum laude* from medical school, earned her medical degree, applied for a residency, and was accepted into the family medicine residency program at St. Mary Mercy Hospital in Livonia, Michigan. Dr. Hamood's clinical evaluations for her first year were very positive, with high marks, and she co-authored a paper with Dr. Stacy O'Dowd, the Program Director. During her second year of residency, the atmosphere at St. Mary Mercy became more hostile towards her. The environment in the family medical residency seemed harassing and oppressive, and Dr. Hamood saw her evaluations in family medicine drop, seemingly overnight. If in fact Dr. Hamood was losing clinical skills, one would expect to see a gradual decrease in clinical performance.  However, the degree of drop in performance was so sudden and completely contrary to her reviews in ***other*** medical specialties – that something else seemed to be at work.

In fact, something else was happening. Starting in her second year of residency, Dr. Hamood endured sexual harassment from male physicians in supervisory roles in the program. Her clinical supervisor, Dr. Anthony Vettraino, groped Dr. Hamood and was later disciplined by the State of Michigan for his behavior. Dr. Rakesh Patel, another of her supervisors, upon seeing Dr. Hamood crying, offered to allow her to use his underpants to dry her tears. Dr. Hamood was put on probation and, after several months, dismissed from the program. Dr. Hamood then sued for sexual harassment. Summary judgment should be denied. Dr. Hamood belongs to a protected group because she was an employee; the facts show that but for the fact of her sex, she would not have been the object of harassment; the conduct was unwelcome; and, there is *respondeat superior*. Her career was destroyed; her abusers should be held accountable by this court.

1

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Finally, "[i]n making this assessment, we must view all evidence in the light most favorable to the nonmoving party." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016).

## COUNTER STATEMENT OF FACTS

### I.     Dr. Hamood Begins Her Residency at St. Mary Mercy Hospital.

Dr. Heather Hamood spent much of her adult life working towards her goal of becoming a medical doctor. While Defendants correctly point out that her academic record as an undergraduate was not perfect, she worked hard, overcame those obstacles, got accepted to medical school at a school in the Caribbean, and graduated *magna cum laude*. (Ex. 1). She was accepted into the family medicine residency program at St. Mary Mercy Hospital in Livonia and signed an employment agreement with them to start as a resident in July of 2015. (Ex. 2).

At the time of Dr. Hamood's residency, Trinity Health Corp. ("Trinity" or "Trinity Health") and Infinity Primary Care, LLC ("Infinity") were deeply intertwined regarding the Family Medicine Residency Program. Trinity Health owned and operated St. Mary Mercy Hospital, and employed the residents, including Dr. Hamood. (Ex. 2). Infinity Primary Care was a separate entity (Ex. 3, 4). Infinity is "composed of primary care physicians, both family medicine and internal medicine. And the relationship between one group in Infinity, which is my group, the Center for Family Care, is that we're independently contracted to provide the educational oversight for the residency program at St. Mary's, and St. Mary's is part of Trinity." (Ex. 5, p. 7:04-:11). Prior to July of 2015, Dr. Vettraino was the program director of the family medicine residency program. (Ex. 6, p. 14:01-:11). When he stepped down, he served as the assistant program director. (Ex. 7, p. 9:08-:13). Dr. Patel had his own practice but was on staff as a faculty member at St. Mary Mercy. (Ex. 8, pp. 9:01-12:02, generally).

It is undisputed that both Infinity and Trinity had the ability to affect the terms of Dr. Hamood's employment, and had control over aspects of that employment. Trinity had control for the simple fact that they were the actual party to Dr. Hamood's employment contract. (Ex. 2). Infinity, while not a party to the contract, nonetheless had the power to determine whether or not Dr. Hamood was progressing in her residency, and whether or not she would be allowed to continue in the program. (Ex. 2). In fact, when Dr. Hamood was eventually terminated, she was terminated by Dr. Stacy O'Dowd, who was a member of Infinity, but not employed by Trinity. (Ex. 9). But this is getting ahead of ourselves.

Dr. Hamood's first year residency was successful. She passed all of her rotations, and received generally positive ratings. (Ex. 10). The comments her preceptors gave her were generally even more positive. (Ex. 10). During that first year she even co-authored an article with her advisor,

the Program Director, Dr. Stacy O'Dowd, which was later published. (Ex. 6, p. 30:12). Dr. Hamood finished her first year of residency in good standing, and in the good graces of her teachers. They had no specific complaints about her. (Ex. 11). She signed her employment contract for year two in July of 2016. (Ex. 12).

## II.     **Dr. Hamood Begins Her Second Year of Residency**.

Dr. Hamood began the second year of her residency on a more troubled note. Dr. Meram, newly appointed as one of the Chief Residents, along with Dr. Christine Queremit, had send out an email to the other residents criticizing the work ethic and attention of some of the residents. (Ex. 13). This email did not sit right with some of the residents, and Dr. Saleh Al-Ameen, a resident in Dr. Hamood's class was critical of the email, with Dr. Hamood supporting him. (Ex. 13). It was around this time that Dr. Hamood felt that some of the other doctors, in particular Dr. Meram and his friend, Dr. Mona Bhatti, turned against her. (Ex. 11, p. 156:10-:16). In addition, Dr. Hamood's primary advisor switched, from Dr. O'Dowd to Dr. Vettraino. Dr. Hamood began her second year with more positive reviews, this time from Dr. Narena Khanchandani, a faculty member in internal medicine[1]. (Ex. 14). Dr. Khanchandani passed Dr. Hamood, with ratings of "Developing" or higher. Dr. Hamood also passed rotations in pulmonology and urology, with Dr. Harb, a urologist, giving her particularly good marks. (Ex. 14). She took ITE, a predictor exam, and scored 400, one of the highest scores in her class. (Ex. 15). Her second year seemed to be off to a good start.

## III.    **Dr. Hamood is Sexually Assaulted by Dr. Vettraino**.

On October 26, 2016, Dr. Hamood's good start to her second year of residency came to a screeching halt. On that day she was at Livonia Family Care Clinic operated by Infinity Primary

---

[1] In numerous depositions it was made clear that internal medicine is a subset of family medicine, with the primary difference being internal medicine doctors do not treat minors or OB/GYN patients, while family medicine practitioners do. *See*, Ex. 5, p. 24:07-:11.

in Livonia as part of her residency, treating patients at the inpatient clinic. (Ex. 11, p. 210:07).

Dr. Hamood was performing a lower back evaluation on a patient, under Dr. Vettraino's

observation. When she was done, Dr. Vettraino told her she was performing the examination

incorrectly. (Ex. 7, p. 65:25-67:23). He asked her to meet him in one of the private rooms, in the

back of the clinic. He told her that her examination technique was wrong. He asked to demonstrate

the examination on her, which she consented to allow. (Ex. 7, *Id.*).

Dr. Hamood has stated clearly and unequivocally that instead of the back exam he stated

he was demonstrating, Dr. Vettraino sexually assaulted her. She described the incident as follows:

> Q.    And then he got down to the -- where the sacroiliac joints and his fingers
> were touching your buttocks?
> A.    Even below.  And I didn't have my white coat on at the time because I was
> done seeing a patient and I had black pants on and I forget what shirt I was
> wearing and then he went below and -- and squeezed.
> Q.    Okay.  His thumbs were on the sacroiliac joint?
> A.    No.  It was like this.  He squeezed like this.
> Q.    Okay.  Were his thumbs on the sacroiliac joint when he did it?
> A.    No.
> Q.    Okay.  And how long did that exactly last?  A second?
> A.    I jumped.  I don't remember exactly.  And I just said, "What are you doing?"
> And then I --
> Q.    Okay.  Was it more than one second?
> A.    Yes.
> (Ex. 11, pp. 225:21-226:11)

Dr. Hamood felt this was an obviously sexual touching, and she had no interest in any sort of

sexual relationship with Dr. Vettraino, and was extremely embarrassed, uncomfortable and

humiliated. In a state of shock, she quickly left the room. (Ex. 11, p. 226:24). To Dr. Hamood, the

incident took on added meaning, as she felt Dr. Vettraino had made inappropriate sexual comments

to her as well, telling her at one point "I should find a woman half my age" and that "I should find

a nice Swedish woman," statements the resonated because Dr. Hamood is roughly half

Dr. Vettraino's age, and she is half Swedish. (Ex. 11, p. 227:12-:15). Out of fear, Dr. Hamood did

not report the incident to human resources, because Dr. Vettraino was her direct supervisor and her entire career was in his hands, as he well knew. He was in a position of extreme power over her, and she was terrified that if she went to human resources to complain about him regarding the sexual assault, they would ruin her life and career. (Ex. 16). This is a common feeling among victims of sexual assault. (Ex. 17).

One question for a factfinder, therefore, is what Vettraino was doing: demonstrating a back exam, or assaulting Dr. Hamood? It is indisputable, however, that his actions were inappropriate. Dr. Hamood filed a licensing complaint against Dr. Vettraino with the Michigan Department of licensing and regulatory affairs. (Ex. 18). After an investigation by the Michigan Attorney General's office, Dr. Vettraino entered into a Consent Judgment where he admitted to performing an improper examination (though he did not admit to improper touching of Dr. Hamood), agreed to pay a $3,500.00 fine, and undergo further training. (Ex. 19).

## IV.   Dr. Hamood Begins to Be Penalized by the Family Medicine Department.

After October 26, 2016, Dr. Hamood saw a sudden and precipitous drop in her reviews in family medicine. A preceptor in the medical field is a supervisor, and Dr. Vettraino had Dr. Hamood's entire career in his hands. He knew this, and said to her to November 2016, shortly after he assaulted her, that if she did not finish her residency, her career and life are over. (Ex. 11, pp. 171:25-172:02). In her first rotation following the assault by Dr. Vettraino, a family medicine rotation, Dr. Hamood was failed by Dr. Mark Michaels, one of Dr. Vettraino's colleagues. (Ex. 14). Dr. Michaels then drafted a memo describing his "concerns" about Dr. Hamood, the first such document by the program. (Ex. 20). Despite the goal of residency being to teach new doctors, Dr. Michaels did not, however, share these concerns with Dr. Hamood.

Beyond that, however, it is clear that Dr. Hamood's poor evaluations were limited to the Family Medicine Department. Her entire second year, she continued to impress the preceptors overseeing her non-family medicine rotations. Her reviews from non-family medicine doctors were at times nothing short of stellar. In her surgical rotation, for example, Dr. Paul Friedman passed her, rated her skills at the level "Attained", the highest rating, or "Developing/Attained", the second highest rating, and stated as his overall comment that " Dr Hammoud [*sic*] is a delight to work with. She is intelligent, poise and reliable. She is a good student of Medicine and a compassionate person. SMM would do well to recruit her as an attending after she completes residency." (Ex. 14). At her deposition, Dr. O'Dowd admitted that Dr. Hamood's evaluation was uniquely positive:

> Q    Okay.  How often do you get reviews that say this doctor would make an
> excellent attending physician and should be hired by St. Mary Mercy?
> A    I've never seen a review.
> Q    Dr. Hamood got one of these reviews, didn't she?
> A    She did.
> Q    So other than her, you've never seen that kind of review?
> A    I've never seen a preceptor write that.
> (Ex. 5, p. 110:05-:13).

 As another example, Dr. Hamood had a rotation for ear, nose and throat (ENT). Dr. Stoler, who was Dr. Hamood's preceptor for this rotation, gave her outstanding marks for the rotation. In the comments, he wrote Dr. Hamood will make a fine family physician. (Ex. 14).

**V.    <u>Dr. Hamood is Placed on Remediation and Terminated.</u>**

Dr. Hamood suffered other setbacks her second year. In November she learned that she had not passed her USMLE Step 3 exam. (Ex. 21). Devastated, she "requested a leave on the grounds that she needed more time, focus time to study for her step 3 exam." (Ex. 6, pp. 46:25-47:01). Once she returned from leave, she was informed by Dr. O'Dowd that she was being placed on a remediation plan, which is "a focused learning tool that we provide to those that are struggling

in the training program, and the program believes that if we give them some additional support and guidance that they'll be able to over time catch up with their peers to be more effective in the program." (Ex. 6, p. 53:17-:22). This decision was made by Dr. O'Dowd, Dr. Vettraino, Dr. Falkenberg and Sue Graham. (Ex. 6, p. 112:08-:10). Dr. Vettraino was in charge of Dr. Hamood's remediation plan on the outpatient days, and Dr. Patel was in charge of here remediation plan on the inpatient days. This arrangement was not standard for remediation plans, if there was a standard:

> Q    If a resident needs to be on remediation plan, are they given a specific faculty
> advisor?
> A    Not necessarily.
> Q    Okay.  If they are not given anyone -- a specific faculty advisor, how does the plan
> proceed?
> A    They'll be working directly with the program director.
> (Ex. 5, p. 56:11-:17).

In addition to wanting to see improvement in her skills, Dr. O'Dowd required that Dr. Hamood re-take her USMLE Step 3 exam, because she felt "USMLE is just another tool to measure the resident's, like, medical knowledge level.  And so the Step 3 would have been also, like I said, also an indication of her medical knowledge." (Ex. 5, p. 113:14-:17). This step seems unusual, because, as Dr. O'Dowd admits, passing or failing the USMLE 3 is not a measure of knowledge, so much as it is a measure of how your score ranks in a particular cohort – the same score can be a passing score one exam, and a failing score the next. (See, Ex. 5, pp. 113:20-116:04).

Shortly after she started her remediation plan, on March 31, 2017, Dr. Hamood was demeaned by Dr. Patel, one of her supervisors. She testified clearly that

> A.    It was approximately three to four o'clock p.m.  And we were rounding on
> some patients and I was with another resident, Dr. Grenda, and Dr. Patel was
> critical of me.  He said I'm not taking my job seriously and I started crying in
> there and then he pulls me in a side conference room on the floor, just me and him
> --
> Q.    This is on a floor of the hospital?

8

A.   It's on the floor of the hospital.  And then he goes -- you know, I'm crying. And then he goes, "Oh, I don't have any Kleenex in here.  Let me give you my underwear to wipe away your tears."
Q.   Okay.
A.   And I just was in shock by that statement.
(Ex. 11, p. 262:3-262:16).

No action was taken to address this wildly inappropriate comment; this was just one more demeaning comment made against Dr. Hamood.

In April 2017, Dr. Patel wrote that Dr. Hamood was showing some improvement, but with Dr. Vettraino as one of her supervisors on the remediation plan, her fate was sealed. Despite her continuing to receive wonderful reviews from non-family medicine preceptors, (Ex. 14), Dr. Hamood was terminated via a letter from Dr. O'Dowd on June 13, 2017, before her remediation plan was complete. (Ex. 9). She had begun seeing a therapist to address the trauma caused by the treatment in her residency program, especially the assault, and to this day she continues to suffer as a result. (Ex. 24).

## VI.   <u>The Appeal Hearing</u>.

Following her termination, Dr. Hamood appealed, as allowed under her employment contract. (Ex. 2). Dr. John O'Brien, the DIO, appointed a panel of three doctors to hear the appeal, per the guidelines. Contrary to the requirements of the employment agreement, however, the panel was not neutral. Dr. David Steinberger, who was one of the panelists, was a member of Infinity. (Ex. 5, pp. 168:16-169:01). Despite Dr. Hamood presenting evidence of sexual harassment, including a polygraph test she passed, the panel voted to uphold her termination. (Ex. 22). No investigation was done of her complaints of harassment while she was employed; only in August were her complaints looked into. (Ex. 23).

There is evidence that at least two male residents were allowed to continue despite being placed on remediation plans or probation, which, according to Dr. O'Dowd, was more serious.

(Ex. 5, p. 153:21-:25). Muhammad Jawaid continued in the program while on probation, and graduated on time. Dr. Zaid Aljhami was extended from July 1st-October 5th, 2016to complete a remediation plan. What Trinity and Infinity did for Muhammad Jawaid and Zaid Aljhami, they did not do for Dr. Hamood. In fact, when she was terminated she became the first, and to date only, physician terminated from the family medicine residency program. (Ex. 5, p. 167:09).

## ARGUMENT

I.  ## SEXUAL HARASSMENT CLAIMS

A.  ### Dr. Hamood Has Established the Existence of a Hostile Work Environment.

It is well-established that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is "quintessentially a question of fact." *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (internal quotation marks omitted). To determine whether a work environment is "hostile" or "abusive," courts look at the totality of the circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). The factfinder must evaluate the conduct at issue by both an objective and subjective standard. *Harris*, 510 U.S. at 21-22. This requires a plaintiff to establish both that the harassing behavior was "severe or pervasive" enough to create an environment that a reasonable person would find objectively hostile or abusive, and that he or she subjectively regarded the environment as abusive. *Id.* Summary judgment is appropriate only if the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment. *Abeita v. Transam. Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir. 1998).

The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a "mathematically precise test." *Abeita*, 159 F.3d at 251 (citation omitted); *see also Harris*, 510 U.S. at 21. The harassment must consist of more than words that simply have sexual content or connotations. *Knox v. Neaton Auto Prods Mfg., Inc.*, 375 F.3d 451, 459-60 (6th Cir 2004) (holding that various comments and foul language were not severe or pervasive); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (holding that plaintiffs must prove more than that a comment was tinged with offensive sexual connotations). Instead, the workplace must be permeated with "discriminatory intimidation, ridicule or insult" sufficiently severe or pervasive to alter the conditions of employment. *Meritor*, *supra* at 65-67 (1986). A non-exhaustive list of factors for the court to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Jordan*, 464 F.3d at 597 (quoting *Harris*, 510 U.S. at 23).

Dr. Hamood has made a sufficient showing to demonstrate a question of fact on this element of her claims. In addition to her allegations that Dr. Vettraino assaulted her, she also alleged that he frequently sat and carried himself in such a way as show an erection through his pants, [cite to transcript], that she was demeaned verbally by Dr. Vettraino – a trait she shared with others. Furthermore, when she was near her lowest, crying in the hospital because of the abuse she had suffered, Dr. Patel, a physician who took an oath to do no harm, and a preceptor and faculty member who saw it as his duty to teach and train new physicians, did not offer her comfort, and did not try to see what he could do to help; instead, he offered to let her wipe her tears away with his underwear. (Ex. 11). If Dr. Hamood was a man, none of this would have happened. There is a

11

clear question of fact that Dr. Hamood has shown the work environment to be hostile and discriminatory.

**B. General Policies for Federal Title VII Claims.**

In 1980 the EEOC issued Guidelines specifying that "sexual harassment," as there defined, is a form of sex discrimination prohibited by Title VII. As an "administrative interpretation of the Act by the enforcing agency," *Griggs* v. *Duke Power Co*., 401 U.S. 424, 433-434 (1971), these Guidelines, "'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance,'" *General Electric Co*. v. *Gilbert*, 429 U.S. 125, 141-142 (1976), quoting *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944). The EEOC Guidelines fully support the view that harassment leading to noneconomic injury can violate Title VII.

In defining "sexual harassment," the Guidelines first describe the kinds of workplace conduct that may be actionable under Title VII. These include "[unwelcome] sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." 29 CFR § 1604.11(a) (1985). Relevant to this case, the Guidelines provide that such sexual misconduct constitutes prohibited "sexual harassment," whether or not it is directly linked to the grant or denial of an economic *quid pro quo*, where "such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." §1604.11(a)(3).

In concluding that so-called "hostile environment" harassment violates Title VII, the EEOC drew upon a substantial body of judicial decisions and EEOC precedent holding that Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult. See generally 45 Fed. Reg. 74676 (1980). *Rogers* v. *EEOC*, 454 F.2d 234 (5th

Cir. 1971), cert. denied, 406 U.S. 957 (1972), was the first case to recognize a cause of action based upon a discriminatory work environment. In *Rogers*, the Court of Appeals for the Fifth Circuit held that a Hispanic complainant could establish a Title VII violation by demonstrating that her employer created an offensive work environment for employees by giving discriminatory service to its Hispanic clientele. The court explained that an employee's protections under Title VII extend beyond the economic aspects of employment:

> [The] phrase "terms, conditions or privileges of employment" in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination…. One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers . . . .
> *Rogers*, 454 F.2d, at 238.

Courts applied this principle to harassment based on race, *e.g., Firefighters Institute for Racial Equality* v. *St. Louis*, 549 F.2d 506, 514-515 (8th Cir.); religion, *e.g., Compston* v. *Borden, Inc*., 424 F. Supp. 157 (SD Ohio 1976), and national origin, *e.g., Cariddi* v. *Kansas City Chiefs Football Club*, 568 F.2d 87, 88 (8th Cir., 1977). Dr. Hamood has met the standards described above.

### C. <u>General Provisions of the Elliot-Larsen Civil Rights Act</u>.

The showing required under Michigan law is largely the same. A hostile work environment claim is actionable under the Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 et seq., when the work environment is so tainted that, in the totality of the circumstances, a reasonable person in the plaintiff's position would have perceived the conduct at issue as substantially interfering with employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment. A ***single incident*** may be sufficient, if severe harassment is perpetrated by an employer in a closely-knit working environment. *Radtke v. Everett,* 442 Mich. 368 (1993) emphasis supplied.

The Elliot-Larsen Civil Rights Act "is aimed at 'the prejudices and biases' borne against persons because of their membership in a certain class, and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases." *Miller v C A Muer Corp*, 420 Mich. 355, 363 (1984) (citations omitted). Accordingly, the act declares that "[a]n employer shall not... discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of...sex...." MCL 37.2202(1)(a). *See also* MCL 37.2202(1)(c). When deciding whether an incident of sexual harassment has occurred, the issue is what a reasonable person would feel in the same situation:

> Rather, we are persuaded that an objective reasonableness standard is mandated by the plain meaning of the statute. When interpreting the Michigan Civil Rights Act, this Court must "give effect to the plain meaning of the language used." *Selk v Detroit Plastic Products*, 419 Mich 1, 9; 345 NW2d 184 (1984). The language at issue reveals that the inquiries in a hostile work environment action inherently involve an examination of the reasonableness of the alleged perpetrator's conduct: "hostile," "intimidating," and "offensive" are terms primarily determined by objective factors.
> *Radtke* at 386-387.

The essence of a sex discrimination civil rights suit is that similarly situated people have been treated differently because of their sex. *C Thorrez Industries, Inc v Civil Rights Comm*, 88 Mich. App. 704, 708 (1979). The act broadly defines sexual discrimination to include sexual harassment:

> Discrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when:
> (i) Submission to such conduct or communication is made a term or condition either explicitly or implicitly to obtain employment ....
> (ii) Submission to or rejection of such conduct or communication by an individual is used as a factor in decisions affecting such individual's employment . . . .
> (iii) Such conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . or creating an intimidating, hostile, or offensive . . . environment.
> MCL 37.2103(h).

Sexual harassment was targeted by the Civil Rights Act because it is both "pervasive" and "destructive, entailing unacceptable personal, organizational, and societal costs." House Legislative Second Analysis, HB 4407, August 15, 1980. Perhaps more important, though, sexual harassment is prohibited in the workplace because it violates civil liberty:

> Sexual harassment should be explicitly defined and prohibited because it is a demeaning, degrading, and coercive activity directed at persons on the basis of their sex, the continuation of which is often contingent on the harasser's economic control over the person being harassed. It should be outlawed because it violates basic human rights of privacy, freedom, sexual integrity and personal security. [*Id.*]

"The threshold for determining that conduct is unwelcome is 'that the employee did not solicit or incite it, and the employee regarded the conduct as undesirable or offensive.'" *Burns v McGregor Electronic Industries, Inc.*, 955 F2d 559, 565 (8th Cir., 1992), quoting *Hall v Gus Construction Co., Inc.*, 842 F2d 1010, 1014 (8th Cir., 1988). It is not disputed that Dr. Hamood did not solicit or incite the behavior complained of in this action; she did not asked to be groped, she did not ask to be harassed, she did not ask to penalized for refusing Dr. Vettraino's sexual advances.

**D.**   **Dr. Hamood Has Presented Evidence of a Quid Pro Quo.**

    **1.   State Claims**

A plaintiff pursuing a claim of quid pro quo harassment under the Elliot-Larsen Civil Rights Act, as Dr. Hamood has, must establish two things: "(1) that she was subject to any of the types of unwelcome sexual conduct or communication described in the statute, and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment." *Hartleip v. McNeilab, Inc*., 83 F.3d 767 (6th Cir. 1996). "Quid pro quo harassment occurs only where an individual is in a position to offer tangible job benefits in exchange for sexual favors or, alternatively, threaten job injury for a failure to submit." *Id*. at 713.

### 2. Title VII Quid Pro Quo Sexual Harassment.

To prevail on a Title VII claim of *quid pro quo* sexual harassment, a plaintiff must assert and prove (1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of *respondeat superior* liability. *See Henson v Dundee*, 682 F.2d 897, 909 (11ᵗʰ Cir., 1982); *Downes v. Federal Aviation Administration*, 775 F.2d 288, 291-92 (Fed. Cir. 1985). *See also, Hill v. BASF Wyandotte Corp.*, 27 F.E.P. Cases 66, 71 (E.D. Mich. 1981).

Under federal law, unlike under the Elliot-Larsen Civil Rights Act, "In a quid pro quo sexual harassment action, an employer is held strictly liable for the conduct of supervisory employees having plenary authority over hiring, advancement, dismissal and discipline under the theory of respondeat superior." *Highlander v. K.F.C. Nat'l Management Co.*, 805 F.2d 644 (6th Cir. 1986), *citing Henson*, 682 F.2d at 910; *Miller v. Bank of America*, 600 F.2d 211, 213 (9th Cir. 1979); *Katz v. Dole*, 709 F.2d 251, 255 n.6 (4th Cir. 1983). Highlander continued: "Because Title VII defines 'employee' to include 'a person engaged in an industry affecting commerce . . . and any agent of such a person,' knowledge of an employment decision based on impermissible sexual factors is imputed to the employer. See, 42 U.S.C. § 2000e(b)." *Highlander*, at 648-659.

Viewed in the light most favorable to Dr. Hamood, at a minimum there is a question of fact as to whether Dr. Hamood's placement on the remediation plan was retaliation for her rejection of Dr. Vettraino's advances. There is no indication a remediation plan was discussed prior to October 26, 2016. Dr. Vettraino was Dr. Hamood's faculty advisor, the assistant program director, core

16

faculty, and the doctor who oversaw her remediation plan. As such, he had plenary authority over her advancement or dismissal, at a minimum. A *quid pro quo* may not have been explicit – they seldom are – but Dr. Hamood clearly believed it was implicit. (See, e.g., Ex. 16).

## E. *Respondeat Superior* **Can Be Shown.**

The final element of a hostile work environment case under state and federal law, as well as a *quid pro quo* case under state law, *respondeat superior*, is met by Dr. Hamood. *Respondeat superior* liability can be imposed on an employer for an employee's hostile environment harassment "if the employer had reasonable notice of the harassment and failed to take appropriate corrective action." *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 426 (2005). "[N]otice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances was such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Id*. at 426. Hence, actual notice is not required; "the test is whether the employer knew or should have known of the harassment." *Id*. It is clear that all parties would have at least had constrictive notice of the harassment by Dr. Vettraino and Dr. Patel.

Under the Elliot-Larsen Civil Rights Act, an employer may avoid liability "if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment." *Downer v Detroit Receiving Hosp*, 191 Mich. App 232, 234 (1991) (applying the standard to a Civil Rights Act claim). Such prompt and appropriate remedial action will permit an employer to avoid liability if the plaintiff accuses either a co-worker, *McCarthy v State Farm Ins Co.*, 170 Mich.App. 451, 457 (1988), or a supervisor of sexual harassment. *McCalla v Ellis*, 180 Mich.App. 372, 380 (1989); *Downer, supra* at 234. An employer, of course, must have notice of alleged harassment before being held liable for not implementing action. *Katz v Dole*, 709 F2d 251, 255 (4th Cir., 1983); *Henson, supra* at 905. If an *employer* is accused of sexual harassment,

17

however, the *respondeat superior* inquiry is unnecessary because holding an employer liable for personal actions is not unfair.

The standard under Michigan law is laid out in *McCarthy v State Farm Ins. Co.*, 170 Mich. App. 451 (1988), this Court explained what was meant by actual or constructive knowledge:

> Where . . . the plaintiff seeks to hold the employer responsible for the hostile environment created by the plaintiff's supervisor or co-worker, she must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action. . . . The employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment . . . or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge.
> *Id*. at 457, *quoting Henson v Dundee*, 682 F.2d 897, 905 (11th Cir., 1982).

Courts must apply an objective standard of review when considering whether the employer was provided adequate notice. Here, Dr. Hamood provided notice of the sexual harassment before her appeal hearing. Instead of hitting pause and investigating, Trinity moved forward on the advice of Dr. O'Dowd, terminating Dr. Hamood without looking at her grave allegations.

**F.   Relations Between Hamood, Trinity Health and Infinity Primary Care.**

Finally, it should be noted that the relationship between Trinity and Infinity means that Dr. Hamood has a viable claim against both Trinity Health and Infinity Primary Care, under the Elliot-Larsen Civil Rights Act. Under Michigan law, "a worker is entitled to bring an action against a nonemployer defendant if the worker can establish that the defendant affected or controlled a term, condition, or privilege of the worker's employment." *McClements v. Ford Motor Co.*, 473 Mich. 373 (2005). There is no question that Trinity Health and Infinity Primary Care are not only intertwined in this matter, they both could affect or control the terms and conditions of Dr. Hamood's employment; are both properly liable to Dr. Hamood. While Dr. Hamood's employment contract was with Trinity Health, Infinity Primary Care was contracted to operate the family

medicine residency program. Dr. Vettraino, who assaulted Dr. Hamood, was an employee of Infinity, the Assistant Program Director, and Dr. Hamood's advisor her second year of residency. When Dr. Hamood was fired, it was not Trinity who fired her, but Dr. O'Dowd, who is a member of Infinity, and Dr. O'Brien who affirmed her termination.

## II.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To establish a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Graham v Ford*, 237 Mich. App. 670, 674 (1999). The conduct complained of must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* It is for the trial court to initially determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *Teadt v. St. John's Evangelical Church*, 237 Mich. App. 567 (1999). Where reasonable individuals may differ, it is for the jury to determine if the conduct was so extreme and outrageous as to permit recovery. *Id*.

In this case, as in *Linebaugh v. Sheraton Mich. Corp.*, it is a question of fact whether the defendant's conduct is sufficient to be so extreme or outrageous as to permit recovery. *Linebaugh v. Sheraton Mich. Corp.*, 198 Mich. App. 335 (1993). In *Linebaugh*, the individual defendant created a cartoon of the plaintiff engaged in a sexual act with a co-worker. The court held that action constitutes conduct so outrageous in character and so extreme in degree that it goes beyond all bounds of common decency in a civilized society. In that case, the testimony of a number of plaintiff's co-workers that the cartoon was offensive proved to be persuasive. Here, Dr. Hamood faced constant harassment, disparagement, and demeaning treatment from Defendant Vettraino

19

and others. Other co-workers witnessed this treatment, including Stacey Askew, a medical assistant, and Dr. Saleh Al-Ameen, one of Dr. Hamood's colleagues in her residency class. (Ex. 25). Dr. Al-Ameen felt that Dr. Vettraino singled individuals or groups of individuals out for abuse. Viewed in the light most favorable to Dr. Hamood this count should proceed.

## **CONCLUSION AND RELIEF SOUGHT**

Viewed in the light most favorable to Ms. Hamood, this Court must conclude that there are questions of material fact that require resolution by a fact finder. The motion should be denied, and this matter should be set for trial.  Accordingly, the Plaintiff, Heather Hamood, respectfully requests that this Honorable Court DENY Defendants' Motion for Summary Judgment.

Respectfully Submitted,

Dated:  January 28, 2020               BY:     /s/ Jeremy C. Kennedy (P64821)
                                                       Jeremy C. Kennedy (P64821)
                                               Attorneys for Defendant/Counter-Plaintiff
                                               24 Frank Lloyd Wright Drive, Ste D-2000
                                               Ann Arbor, MI  48105
                                               (734) 665-4441
                                               jkennedy@psedlaw.com

## INDEX OF EXHIBITS

1. Plaintiff's Medical School Record

2. Contract Between heather Hamood and Trinity Health Corp. for PGY-1

3. Authorization to Do Business in Michigan for Trinity Health Corporation

4. Articles of Organization Infinity Primary Care, PLLC

5. Transcript, Deposition of Stacey O'Dowd

6. Transcript, Deposition of Susan Greenwood-Clark

7. Transcript, Deposition of Anthony Vettraino

8. Transcript, Deposition of Rakesh Patel

9. Termination Letter

10. Hamood PGY-1 Reviews

11. Transcript, Deposition of Heather Hamood

12. Contract Between heather Hamood and Trinity Health Corp. for PGY-2

13. Email chain between St. Mary Mercy Family Medicine Residents

14. Hamood PGY-2 Reviews

15. Hamood Semi-Annual Reviews

16. Affidavit of Heather Hamood

17. Articles Regarding Sexual Assault Victims' Failure to Report

18. Michigan Department of Licensing and Regulatory Affairs Licensing Complaint against Anthony Vettraino

19. Consent Judgment Between Michigan Department of Attorney General and Dr. Anthony Vettraino

20. Memo by Dr. Mark Michaels dated November 13, 2016.

21. Heather Hamood USMLE Step 3 Results, March 2017.

22. Polygraph Examination results presented to St. Mary Mercy Appeal Board.

23. St. Mary Mercy investigation of Hamood complaints.

24.    Report of Dr. Hampton Walker

25.    Affidavit of Stacey Askew

**CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

/s/Margaret A. Michael
Legal Assistant to Jeremy C. Kennedy (P64821)